(No. 53415.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LUIS RUIZ, Appellant.

*Opinion filed December 17, 1982.—Rehearing denied January 28, 1983.*

246

250

SIMON, J., concurring in part and dissenting in part.

Joel S. Ostrow, of Chicago, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Melbourne A. Noel, Jr., and Thomas E. Holum, Assistant

Attorneys General, and Marcia B. Orr and James S. Veldman, Assistant State's Attorneys, of Chicago, of counsel), for the People.

CHIEF JUSTICE RYAN delivered the opinion of the court:

By information filed in the circuit court of Cook County, Luis Ruiz and Juan Caballero were charged with the murders of Michael Salcido, Arthur Salcido, and Frank Mussa. The defendants were also charged with armed violence (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 33A—2) and unlawful restraint (Ill. Rev. Stat. 1979, ch. 38, par. 10—3(a)) as to each of the victims. Ruiz and Caballero were granted a severance and were subsequently tried simultaneously before a single judge, making use of two separate juries. At the conclusion of trial, the Ruiz jury returned a verdict of guilty on all counts. The prosecutor requested a hearing to consider whether the death penalty should be imposed. The defendant waived a jury and, after hearing evidence in aggravation and mitigation, the trial judge sentenced Luis Ruiz to death. (Ill. Rev. Stat., 1978 Supp., ch. 38, pars. 9—1(d), (h).) The sentence was stayed (73 Ill. 2d R. 609(a)), pending direct appeal to this court pursuant to Rule 603 (73 Ill. 2d R. 603). Caballero was also convicted of three counts of murder, three counts of armed violence and three counts of unlawful restraint. After a separate sentencing hearing he was also sentenced to death. We consider in this appeal only the conviction and sentence of Luis Ruiz.

For the reasons expressed in this opinion, we affirm the conviction and sentence of death.

On the evening of February 24, 1979, Arthur Salcido, then 19 years of age, and Frank Mussa, 16 years of age, both of Princeton, Illinois, together with Arthur's brother, Michael Salcido, 17 years of age, drove from Princeton to Chicago. Michael had been visiting his

brother in Princeton, and that night the three boys went to his mother's apartment in Chicago. The boys had borrowed a car in Princeton and arrived in the city about midnight. At approximately 1 a.m., the three youths left the apartment and drove to an all-night restaurant in the neighborhood.

Defendant Luis Ruiz, aged 19, Juan Caballero, Placedo Laboy, and a fourth youth named Aviles, encountered Arthur, Michael and Frank in the restaurant. Michael approached Ruiz and inquired whether he knew where some marijuana could be obtained. Ruiz responded that he did not have any marijuana and he did not know where any could be obtained. Michael then asked Ruiz if he knew a person named Jose Cortez, a Latin Eagle. Ruiz, who was himself a member of a rival gang, the Latin Kings, asked Michael if he was a Latin Eagle. Michael responded affirmatively. Ruiz then told Michael that he and his companions were also Latin Eagles. At this point, Michael began to brag to Ruiz that he had ridden on "hits" with the Eagles and had been the driver on one such "hit" by the Eagles on two Latin Queens, the female companions and counterparts of the Latin Kings. After this exchange, Ruiz told Michael that he did in fact know where to obtain marijuana and that he would show Michael where to get it.

All got into the victims' automobile with Michael, Arthur and Frank in the front. Ruiz and his companions were in the back seat. Ruiz directed the driver into an alley where Ruiz and his companions got out of the car. They told Michael to accompany them down the alley and they would show him the location of the marijuana. Once they were out of sight of the automobile, Ruiz and his friends revealed that they were not Eagles but were instead Latin Kings, after which they beat Michael Salcido to the ground. When the beating was over, Laboy produced a gun and Aviles a knife, and they all

marched Michael back to the car.

All seven youths then got into the car at the direction of Ruiz and his group. Laboy took over as driver, with Ruiz occupying the back seat along with Michael. Laboy drove to a second alley which was T-shaped. He drove some distance down the "T" where he stopped the car. Laboy and Caballero then took Michael and Frank around the corner of the alley and forced them to lie face down in the snow. Ruiz remained with the car while Aviles stabbed and killed Arthur Salcido in the automobile. Laboy then brought Frank Mussa back to the car, took the same knife, and stabbed Frank Mussa to death. Finally, Caballero returned with Michael Salcido and stabbed him to death in the back seat of the car. The members of the group then took articles of clothing from the trunk of the victims' automobile and attempted to wipe the vehicle clean of fingerprints. After completing this task, Ruiz and the others all left the scene. Ruiz and Caballero were arrested on March 3, 1979, and charged with the offenses described above.

In this appeal, defendant argues that because there is no evidence that he actually did any of the acts which resulted in death, his conviction on the principle of accountability cannot form the basis for imposition of the death penalty under the Illinois statute (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 9—1). Further, if the statute allows death to be imposed on a defendant who is merely accountable for the conduct of another, such provision is unconstitutional. In addition, the defendant argues that the procedure employed at trial denied his right to a severance and that he has not been proved guilty beyond a reasonable doubt.

We turn first to a consideration of whether the proof adduced at trial is sufficient to sustain a conviction for murder, armed violence, and unlawful restraint. We agree with the defendant that there is no direct evidence

establishing that Ruiz ever struck any of the blows that resulted in the deaths of the victims. However, the case was submitted to the jury with proper instructions setting forth the principle of accountability, and the record proves Ruiz' guilt on each charge beyond a reasonable doubt as a willing participant in the criminal enterprise. There is no doubt that Ruiz was legally accountable for the conduct of his companions and, as such, shares equally in their guilt.

In *People v. Rybka* (1959), 16 Ill. 2d 394, this court upheld the defendants' murder convictions predicated solely upon their being accountable for the actors' conduct, even though they were not present during the crime. In *Rybka,* 13 persons embarked upon a venture to "get a negro." (16 Ill. 2d 394, 400.) They departed in two groups, employing separate vehicles, an Oldsmobile and a Chrysler. The two groups started out together, being led by the Oldsmobile, but soon became separated. The occupants of the Chrysler eventually disbanded and went home without incident. The other group, however, accomplished their purpose when one of them struck the victim in the head with a hammer. Despite the fact that defendants Gorski and Budz were occupants of the Chrysler and consequently not present when the crime was committed, this court upheld their convictions for murder and observed:

> "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction as a principal for a crime committed by another in furtherance of the venture. *People v. Tarver,* 381 Ill. 411; *People v. Rudecki,* 309 Ill. 125." *People v. Rybka* (1959), 16 Ill. 2d 394, 405.

Active participation has never been a requirement for the imposition of criminal guilt upon the theory of accountability. *People v. Morgan* (1977), 67 Ill. 2d 1, 9; *People v. Kessler* (1974), 57 Ill. 2d 493, 497-98, *cert. denied* (1974),

419 U.S. 1054, 42 L. Ed. 2d 650, 95 S. Ct. 635; *People v. Allen* (1974), 56 Ill. 2d 536, 541, *cert. denied* (1974), 419 U.S. 865, 42 L. Ed. 2d 102, 95 S. Ct. 120; *People v. Hill* (1968), 39 Ill. 2d 125, 134-35, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305; *People v. Johnson* (1966), 35 Ill. 2d 624, 626; *People v. Richardson* (1965), 32 Ill. 2d 472, 476-77, *cert. denied* (1966), 384 U.S. 1021, 16 L. Ed. 2d 1023, 86 S. Ct. 1935.

Section 5—2(c) of the Criminal Code of 1961 provides that a person is legally accountable for conduct of another when:

"Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. ***" Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c).

In this case, the testimony of Julio Lopez and the assistant State's Attorney, to whom Ruiz made incriminating statements, establishes that Ruiz was a principal character in the common enterprise obviously bent on committing acts of violence upon the victims. Ruiz admitted to the State's Attorney that he initiated the plan to mislead the victims into believing that Ruiz and his group were Latin Eagles. This admission was corroborated by Julio Lopez, who testified that on March 2, 1979, Ruiz, in the presence of Placedo Laboy and himself, stated, "Do you know who 'offed' those three guys in that car? It was us." Ruiz then went on to relate the details of the event, including the fact that they had misled their victims into believing they were Latin Eagles instead of Latin Kings. The only conceivable purpose of the deception was to allow Ruiz and his friends to maneuver the victims into a situation where they could avenge the "hit" upon the Latin Queens, of which Michael had bragged earlier. Having aided Caballero and the others in their plot to do violence to these victims by deceiving them and getting them into the car, Ruiz became accountable for the conduct of each member of the group.

In fact, the evidence discloses that it was Ruiz who told the victims he could procure marijuana for them and who directed them to drive into the alley where Ruiz and his companions administered a severe beating to Michael. After the beating, Ruiz again entered the car, which then proceeded to the location where the victims were brutally murdered. The defendant argues that his mere presence at the scene of the crime does not make him accountable for the murders. The evidence shows much more than the defendant's mere presence. His continued presence during the commission of all three murders, plus his participation in the attempt to obliterate fingerprints after the crimes were committed, are alone sufficient to show " 'a common design to do an unlawful act to which all assent.' " (*People v. Morgan* (1977), 67 Ill. 2d 1, 10, *cert. denied* (1977), 434 U.S. 927, 54 L. Ed. 2d 287, 98 S. Ct. 411; *People v. Washington* (1962), 26 Ill. 2d 207, 209.) Later in this opinion we shall discuss additional evidence concerning the extent of Ruiz' involvement.

We also reject the defendant's assertion that because he did not take the knife and did nothing to facilitate the actual killings he had somehow withdrawn from the enterprise and ceased to be accountable for the conduct of the others. Once a person becomes accountable for the conduct of another, he remains so until he detaches himself from the criminal enterprise. (*People v. Brown* (1962), 26 Ill. 2d 308; *People v. Rybka* (1959), 16 Ill. 2d 394, 406; Ill. Rev. Stat. 1979, ch. 38, par. 5—2(c)(3).) The defendant in this case has failed to produce any evidence of his withdrawal. In point of fact, all inferences to be drawn from the record are to the contrary. If Ruiz desired to withdraw from the murders of these three boys, he had ample opportunity even after Michael had been beaten. The fact that Ruiz got into the car and rode to the second alley, and remained during the commission of all three murders, destroys any notion that he was no longer participating in the criminal

enterprise. Further, as noted earlier, after the crime had been completed, all of the perpetrators, including Ruiz, remained at the scene to wipe fingerprints off of the vehicle. Evidence of events occurring after the crime had been committed is competent to show participation in the crime itself. *People v. Kolep* (1963), 29 Ill. 2d 116, 120.

We turn next to the matter of how this trial was conducted and the issue raised concerning severance. The defendant's contention is basically that although his motion for a severance was granted, the trial court negated its effect by conducting a simultaneous trial before two juries and ruling that if either defendant took the stand to testify, both juries would be present. The defendant argues that this action deprived him of his right to a severance and amounted to a denial of a fair trial.

An accused does not have a right to be tried separately from his companions when charged with offenses arising out of a common occurrence. (*People v. Yonder* (1969), 44 Ill. 2d 376, 386, *cert. denied* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094; *People v. Watt* (1942), 380 Ill. 610, 613.) The question of whether a severance should be granted in a particular case is a matter largely within the discretion of the trial judge. (*People v. Henderson* (1967), 37 Ill. 2d 489, 492, *cert. denied* (1967), 389 U.S. 943, 19 L. Ed. 2d 297, 88 S. Ct. 305.) The primary question to be considered is whether the defenses of the several defendants are so antagonistic that any or all of them could not receive a fair trial unless a severance is granted. (*People v. Brooks* (1972), 51 Ill. 2d 156, 166; *People v. Bernette* (1970), 45 Ill. 2d 227, 241, *rev'd on other grounds* (1971), 403 U.S. 947, 29 L. Ed. 2d 858, 91 S. Ct. 2290-91; *People v. Gendron* (1968), 41 Ill. 2d 351, 357, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179.) Here, neither Ruiz nor Caballero gave notice that he intended to proceed by way of any defense which would be inconsistent with their presence at the crime scene or their mental ca-

pacity to commit these offenses. It would be pure speculation to conclude that either of these defendants was forced not to testify, or was otherwise prejudiced by the fear that accusatory testimony might be delivered by the other in retaliation. Mere apprehension of a particular result will not sustain an allegation of prejudice to the accused. *People v. Yonder* (1969), 44 Ill. 2d 376, 386, *cert. denied* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094; *People v. Gendron* (1968), 41 Ill. 2d 351, 357, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179.

Moreover, the motion for severance was granted in this case primarily to avoid possible conflict with *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. Caballero had apparently made certain incriminating statements which implicated Ruiz. To avoid the possibility that these statements would be admitted into evidence as a confession, regardless of whether Caballero took the stand, and thereby violate the *Bruton* rule as to Ruiz, the trial court employed two juries. Under the procedure used, including the ruling that both juries would hear the testimony of either defendant, any possible conflict with *Bruton* was avoided. The reason is that if Caballero took the stand and, consistent with his prior statement, implicated Ruiz, he would be in effect a State's witness against him, subject to cross-examination the same as any other witness. In this situation the *Bruton* problem is avoided because the out-of-court statement would not be put into evidence. On the other hand, if Caballero did not take the stand and the State attempted to introduce the statement as proof of Caballero's guilt, any potential conflict with *Bruton* could be avoided by removing the Ruiz jury. In addition, even if the trial judge had ruled that both juries would be present during cross-examination, *Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723, would compel us to hold that such ruling would be correct. In *Nelson,* the Supreme Court held that in a joint

trial before a single jury a defendant's sixth amendment rights were not violated when his codefendant took the stand and was subsequently impeached with a prior statement implicating the defendant.

We hold therefore that since both juries would have been entitled to hear the testimony of these defendants, the trial court's granting of the motion upon these conditions was not an abuse of discretion, nor did it prejudice defendant Ruiz so as to deny him a fair trial. There remains, however, the question of whether the procedure of employing two juries in this fashion amounts to a *per se* denial of some constitutional protection.

This identical issue has been presented and resolved in favor of the multiple-jury procedure as a device to avoid the *Bruton* confrontation problem. In *United States v. Sidman* (9th Cir. 1972), 470 F.2d 1158, *cert. denied* (1973), 409 U.S. 1127, 35 L. Ed. 2d 260, 93 S. Ct. 948, the court, recognizing the potential for error of constitutional proportions, nonetheless found that multiple juries did not deny an accused any of his rights provided by the Constitution or the Federal Rules of Criminal Procedure. The same conclusion has been reached in other cases. (See *United States v. Rowan* (6th Cir. 1975), 518 F.2d 685, *cert. denied* (1975), 423 U.S. 949, 46 L. Ed. 2d 284, 96 S. Ct. 368; *United States v. Rimar* (6th Cir. 1977), 558 F.2d 1271, *cert. denied* (1978), 435 U.S. 922, 55 L. Ed. 2d 515, 98 S. Ct. 1484.) While we, too, recognize the possibility for prejudicial error resulting from confusion at trial inherent in this procedure, we conclude that in this case no such error exists.

From the onset the trial judge exercised extreme caution in instructing each member of the two juries as to what exactly was going on. The record is replete with reminders and admonishments to the effect that neither jury is to discuss any aspect of the case with the other. Each side was well aware of the presence of the other jury, and counsel, along with the court, took great care in insuring

that each jury heard only that evidence which was relevant to each respective case. Due to the nature of the testimony, most of the evidence offered at trial was admissible against both defendants. The record fails to disclose a single incident of confusion or impropriety. The Supreme Court has observed that a defendant in a criminal case is entitled to a fair trial, not a perfect one. (*Lutwak v. United States* (1952), 344 U.S. 604, 619, 97 L. Ed. 593, 605, 73 S. Ct. 481, 490.) Based upon the record now before us, we believe that mandate has been fulfilled in this case.

The defendant next argues that the Illinois statute providing for imposition of the death sentence was not intended to be applied to those persons found guilty of murder under the theory of accountability. We do not agree. The statute does not specifically preclude the imposition of the death penalty if the defendant's conviction is based on accountability. Section 9—1(c)(5), however, lists, as a mitigating factor, "the defendant was not personally present during the commission of the act or acts causing death." (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 9—1(c)(5).) Thus, if a defendant were convicted of murder under the accountability theory, and was not personally present when the acts causing death were committed, as was the case with some of the defendants in *People v. Rybka* (1959), 16 Ill. 2d 394, mentioned above, this fact may be considered in mitigation. By contrast, there is no provision in the statute for special consideration of a defendant convicted on the theory of accountability when he is personally present when the acts causing death are committed. It would appear that the typical case in which a defendant would not be present during the act or acts causing death would be a case in which the defendant would be found guilty of murder on the basis of accountability. If the legislature had intended that the death penalty would not be applicable where the defendant is found guilty of murder on the basis of accountability, there would have been no reason to pro-

vide for his absence as a mitigating factor.

The defendant notes that the legislature, in cases of felony murder, precludes the imposition of the death penalty if the defendant did not actually kill the individual. (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 9—1(b)(6)(a).) The defendant argues that this establishes the legislature's intent that any defendant who does not strike the fatal blow should not be sentenced to death. This conclusion does not follow. Since the only intent necessary to support a felony-murder conviction is that to commit the underlying felony (*People v. Hickman* (1974), 59 Ill. 2d 89, *cert. denied* (1975), 421 U.S. 913, 43 L. Ed. 2d 779, 95 S. Ct. 1571; *People v. Auilar* (1974), 59 Ill. 2d 95, 101; *People v. Miller* (1980), 89 Ill. App. 3d 973, 979; *People v. Nelson* (1979), 73 Ill. App. 3d 593, 595; Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)), the legislature provided that the death penalty can only be imposed upon the one actually doing the killing, to avoid the possibility of a person being put to death without having possessed even the general intent for the crime of murder. Also, as noted above, it provided that a mitigating factor in other murders, obviously based on accountability, is the lack of personal presence. If the legislature intended that the death penalty not be imposed on those who were personally present but did not actually kill in every case, it could have so provided. The trial court properly noted that accountability is not incompatible with the death penalty in cases other then felony murders.

In addition to the evidence as to Ruiz' involvement previously noted, some other evidence not previously recited is extremely significant. Julio Lopez, a former member of the Latin Kings gang, testified that Ruiz, in telling him of the murders, said that he, Ruiz, held a gun on the victims while the others did the stabbing and that he checked the bodies afterwards to see if the victims were dead. The defendant contends that since Lopez did not include these comments in his prior statement to the assistant State's

Attorney, they are not worthy of belief. The degree to which Lopez' testimony may have been discredited must be determined by the trier of fact at the trial, or by the trial judge at the sentencing hearing, if the hearing is before the judge and not a jury. We cannot say, as a matter of law, that Lopez' testimony had no probative value. On the contrary, it strongly supports the verdicts of guilty and the judge's decision as to the penalty. Although the statements concerning the gun and checking of the bodies do not show that Ruiz struck the actual blow that killed the victims, they do show a substantial involvement by Ruiz in the actual killings.

Also, the assistant State's Attorney who questioned Ruiz testified that, in relating his story, Ruiz told him that after they had beaten Michael and before arriving at the alley where the victims were murdered, Placedo Laboy stated that they would have to kill these people because they had seen their faces. The assistant State's Attorney also testified that Ruiz told him that when the boys were being stabbed, he stayed outside the car and that, after Frank had been stabbed, Laboy handed him the knife, but he refused to take it. Michael was then brought to the car, pushed into the back seat, and stabbed by Juan Caballero. Although Ruiz consented to be interviewed by the assistant State's Attorney, he refused to give a statement in the presence of a court reporter. The assistant State's Attorney's testimony was based on a memorandum he had prepared following his interview with Ruiz and also based on his memory. In any event, all of the evidence, both favorable and unfavorable to the accused, was properly presented to the jury at trial, and the judge during sentencing, for their consideration as to its persuasiveness. The defendant has failed to establish that any of the incriminating evidence was not worthy of belief as a matter of law.

The defendant relies heavily on Justice White's concurring opinion in *Lockett v. Ohio* (1978), 438 U.S. 586, 621-

28, 57 L. Ed. 2d 973, 1000-04, 98 S. Ct. 2954, 2981-85 in support of his contention that the death penalty cannot be constitutionally imposed upon a defendant guilty of murder on the basis of accountability. We find this reliance to be misplaced. Justice White's opinion does not state that a person who does not do the actual killing may not constitutionally be sentenced to death. The opinion, instead, is concerned with the question of intent. In that case the defendant was participating in a planned robbery and was seated in a car while her companions, in the course of the robbery, killed a person. Justice White expressed the concern that although proved guilty beyond a reasonable doubt, it was not established that Lockett possessed any intent to kill independent of the person who actually performed the acts resulting in death. As noted earlier, under our statute, the death penalty will not be imposed where a defendant is convicted of felony murder unless he performed the acts which resulted in death. This limitation insures that an inference of at least the general intent sufficient to support a murder conviction will be present before someone is put to death for felony murder. Where guilt is premised on the accountability theory the intent of the actor is imputed to the defendant but his absence from the crime scene will be a mitigating factor that would prevent imposition of the ultimate penalty in cases like *Rybka*. Moreover, the concurring opinion of Justice White recognizes that the facts of a particular case might well permit an inference that the defendant had the requisite intent independent of any imputed to him by way of accountability. This conforms to the settled law of this State holding that the intent to take a life may be inferred from defendant's acts and the circumstances surrounding the commission of the offense. *People v. Jones* (1979), 81 Ill. 2d 1, 9-10; *People v. Muir* (1977), 67 Ill. 2d 86, *cert. denied* (1977), 434 U.S. 986, 54 L. Ed. 2d 481, 98 S. Ct. 615 (partially overruled in *People v. Harris* (1978), 72 Ill. 2d 16, 27); *People v. Koshiol* (1970), 45 Ill. 2d

573, *cert. denied* (1971), 401 U.S. 978, 28 L. Ed. 2d 329, 91 S. Ct. 1209; *People v. Coolidge* (1963), 26 Ill. 2d 533.

In this case Ruiz' intent to participate in the premeditated acts resulting in the death of the three victims is established beyond a reasonable doubt, whether considered under the accountability statute (Ill. Rev. Stat. 1977, ch. 38, par. 5—1 *et seq.*), or whether his intent is judged solely from his own acts and conduct. In support of this conclusion it is again appropriate to reiterate Ruiz' participation in this series of tragic events.

It was Ruiz who first deceived the three victims by telling them that he was a Latin Eagle when they bragged to him that they had participated in a "hit" on some Latin Queens. It was Ruiz who directed that they all get into the victims' car and drive to the first alley. Ruiz took Michael down the alley and participated in beating him to the ground. Ruiz told the assistant State's Attorney that his companions said that they would have to kill the three boys. After learning this, when they stopped in the second alley, Ruiz did not depart but stayed while each of the three was systematically and ruthlessly executed. Arthur Salcido was stabbed a total of eight times in the chest, and his throat was cut completely across, severing his windpipe, as well as the major arteries on either side of his neck. Frank Mussa was stabbed a total of 21 times: three times in the neck, three times in the chest and 15 times in the back. Michael Salcido was stabbed a total of 18 times: 10 times in the face and neck, five times in the abdomen and three times in the back. Ruiz never told either Lopez or the assistant State's Attorney that he protested while all of these blows were being struck. In fact, nothing in the record shows what he was doing during the considerable time that it took to perform these acts, which must have been accomplished in the face of extreme effort on the part of the victims to preserve themselves and through greater efforts on the parts of the participants to over-

come the victims' defenses. In any event, when all was finished, Ruiz assisted the others in wiping the car free of fingerprints and then walked away from the scene with his companions. Even without considering the testimony of Lopez that Ruiz said he held a gun on the victims and felt their bodies to see if they were dead, the evidence is sufficient to prove Ruiz guilty of three murders beyond a reasonable doubt, along with the necessary intent required to establish the aggravating factor set forth in section 9—1(b)(3).

The defendant also contends that the indictment did not sufficiently inform him that the death penalty would be sought. In *People v. Brownell* (1980), 79 Ill. 2d 508, *appeal dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59, this court held that the charge in the indictment constitutes sufficient notice that the death penalty would be sought. Although Ruiz acknowledges that he was charged with killing three people, which, under the statute, would make him eligible for the death penalty, he contends that the statute removes accountability convictions from the death penalty. Therefore he argues that the charge failed to inform him that the death penalty would be sought. Since our statute provides that a person convicted of felony murder is not subject to the death penalty unless he actually did the killing, Ruiz argues that this provision of the statute, by implication, prohibits the imposition of the death penalty where one is convicted of murder on the basis of accountability. This argument has been disposed of by our holding above that section 9—1(b)(6) does not remove accountability convictions as a foundation for the death penalty. Consequently, based upon *Brownell,* the defendant was sufficiently informed that the death penalty would be sought.

It is appropriate to distinguish the result here reached from another recent decision of this court. In *People v. Gleckler* (1980), 82 Ill. 2d 145, we vacated the death sen-

tence imposed by a jury partly because of the mitigating factors presented and the extent of the defendant's participation relative to his codefendants'. In *Gleckler*, although the accused did in fact fire shotgun blasts into the heads of two young boys, his overall involvement in the episode was shown to be that of a follower. A great deal of evidence was produced in mitigation to show the accused's limited mental capacity, his docile personality, and his "definite propensity to go along with whatever events were happening at the time." (82 Ill. 2d 145, 164.) It was also established that the defendant was an alcoholic and that he had been drinking on the night of the murders. We also considered that Gleckler did not have a criminal record. These factors in mitigation, coupled with the fact that Theodore Parsons, charged with the same murders and far more culpable than Gleckler, received only a prison term, led a majority of this court to conclude that "Gleckler, with no criminal history, the personality of a doormat, and a problem with alcohol, was not the ringleader in this sordid affair; nor are his rehabilitative prospects demonstrably poorer than those who received imprisonment terms. Our revulsion toward this crime and our lack of sympathy for Gleckler cannot justify executing only him." *People v. Gleckler* (1980), 82 Ill. 2d 145, 171.

By contrast, the trial judge in this case was presented with no mitigating factors other than the testimony of one police officer to whom the defendant had expressed remorse and the argument of counsel that Ruiz did not take an active part in the crime because he feared for his own life. However, although Ruiz did not stab the victims, he was not a "follower" or a "doormat." We believe the inference that he actively participated in and directed the commission of crime could easily have been drawn by both the jury and the judge during the sentencing hearing. It is inconceivable that these three victims would calmly submit to their own systematic slaughter without resistance. It would

likewise be absurd to preclude the inference that *all* of the perpetrators actively participated in overcoming such resistance by restraint and other acts of violence until each victim was finally killed. We cannot, therefore, reverse the trial court's ruling that no mitigating factors sufficient to preclude the death penalty had been proved. We believe that imposing the ultimate penalty of death based upon the evidence presented against Ruiz and the inferences properly drawn therefrom does not amount to cruel and unusual punishment. Nor is this case like *Gleckler*, where sufficient mitigating factors precluded imposition of the ultimate penalty.

Finally, the defendant asserts that the court improperly considered evidence in aggravation. At the sentencing hearing, both sides stipulated that if the State called all of its witnesses previously produced at trial, they would testify similarly. Thereafter, the State introduced testimony establishing that Thomas Griebell, age 16, died as a result of a gunshot wound to the head which he received on July 13, 1976. The State next called an assistant State's Attorney who laid the foundation for introduction of a statement, signed by Luis Ruiz, that admitted in great detail the events of July 13, 1976. The document related in essence that Luis Ruiz fired a rifle from a gangway into a crowded parking lot across a street and thereafter saw a person in the parking lot grab his head and fall to the ground. This act was done in furtherance of plans made earlier that day by Ruiz and others to "hit a Royal." The parking lot into which Ruiz fired was adjacent to a restaurant used as a meeting place for members of that gang. The defendant objected to the introduction of this document and now contends that, since no conviction resulted from the alleged event, it was error for the court to consider it. In *People v. La Pointe* (1981), 88 Ill. 2d 482, we discussed this question in detail and held that a judge conducting a sentencing hearing is not limited to considering

evidence that would only be admissible during a trial but could exercise wide discretion in the types of evidence used to assist him in determining the punishment to be imposed. The defendant's argument in our case is clearly answered by the statute. Section 9—1(e) provides that during the sentencing hearing any evidence relative to the aggravating factors set out in subsection (b) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)) may be presented "under the rules governing the admission of evidence at criminal trials." This section further provides that any additional aggravating factor may be presented "regardless of its admissibility under the rules governing the admission of evidence at criminal trials." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e).) The evidence objected to did not pertain to an aggravating factor set out in subsection (b). The rules governing the admissibility of evidence at criminal trials therefore would not apply to this statement of the defendant. The statement was properly admitted for the consideration of the trial judge in determining the penalty to be imposed.

This case has been held under advisement pending the filing of an opinion by the United States Supreme Court in *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368. The holding of the majority in that case is stated as follows:

> "[I]t is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. We have concluded, along with most legislatures and juries, that it does not." 458 U.S. 782, 797, 73 L. Ed. 2d 1140, 1151, 102 S. Ct. 3368, 3376-77.

In *Enmund v. Florida* the court emphasized that the focus must be on the culpability of the defendant Enmund, not on that of those who, during the course of the robbery, shot the victims. Enmund was a robber and aided and

abetted a robbery, in the course of which murder was committed by others. Enmund's criminal culpability was thus limited to his participation in the robbery and his punishment was tailored to his personal responsibility and moral guilt. (458 U.S. 782, 798, 73 L. Ed. 2d 1140, 1152, 102 S. Ct. 3368, 3377.) The evidence showed that Enmund, although intending to participate in the robbery of the victims, stayed in an automobile while his two accomplices approached the victims' home, robbed them and then killed both victims after one of them had shot and wounded one of the accomplices.

"Enmund himself did not kill or attempt to kill; and as construed by the Florida Supreme Court, the record before us does not warrant a finding that Enmund had any intention of participating in or facilitating a murder." 458 U.S. 782, 798, 73 L. Ed. 2d 1140, 1152, 102 S. Ct. 3368, 3377.

We have detailed above the participation of Luis Ruiz in the three murders involved in this case. In *Enmund v. Florida* the defendant was found guilty of *felony* murder solely on the basis of his participation in the commission of the felony, robbery. In our case Ruiz was not tried or convicted on the theory of felony murder. We noted above in this opinion that, under our statute, the death penalty cannot be imposed for felony murder unless the defendant actually kills the victim. (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 9—1(b)(6)(a).) In our case Ruiz was present throughout the violent episode, actively participated, except for striking a fatal blow, and his conduct was such as to support an inference that he possessed the intent to take the lives of the victims.

Nothing in the holding or the language of the majority opinion in *Enmund v. Florida* requires a conclusion in this case contrary to that reached above.

For the reasons stated, the judgments of conviction and sentence of death of the circuit court of Cook County are affirmed. The clerk of this court is directed to enter an or-

der fixing Wednesday, March 16, 1983, as the date on which the sentence of death entered in the circuit court shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections and the wardens of the Illinois State Penitentiary at Menard and Joliet.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part:

I dissent from the imposition of the death sentence for the reasons set forth in my dissent in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting). I also dissent from the majority's holding that the death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) covers defendants such as Luis Ruiz who are convicted of murder under the theory of accountability. My judgment is that the intent of the legislature and the plain language of the statute restrict the scope of the death penalty to defendants who kill or who actually possess the intent required for murder, and exclude from its coverage those individuals who are convicted of murder under a theory which does not require that they do the killing and under which "intent" to kill may be imputed.

The death penalty provisions appear in subsections (b) and (c) of the murder statute, which is section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b), (c).) Subsection (a) of the statute, to which the next two subsections refer, does not mention accountability or imputed intent other than through felony murder, and in fact states clearly that "[a] person who kills an individual without lawful justification commits murder if, *in performing the acts which cause the death ***.*" (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a).) The crime of murder by accountability is not defined in section 9—1, or anywhere specifically in the Criminal Code of 1961; instead, it derives from sections 5—1, 5—2 and 5—3 of the

Code (Ill. Rev. Stat. 1979, ch. 38, pars. 5—1, 5—2, 5—3) by applying those sections in conjunction with the murder statute. The placement of the death penalty provisions within the murder statute rather than as a separate section, combined with the introductory language of the murder statute which I have quoted, suggests that the death penalty was never meant to be imposed on a person who committed none of the acts which caused the victim's death and who can be convicted of murder only by means of accountability.

This conclusion is bolstered by the wording of the statutory sections involved. Subsection (b) of our murder statute sets forth eight aggravating factors the presence of which will permit the death penalty to be imposed. Except for the fifth factor, which involves the hiring of another to perform a murder, only one of the factors enumerated allows death for a murder in which the defendant did not personally do the killing. The sixth aggravating factor, which pertains to felony murder, is the only one which could even remotely involve a defendant who, like Ruiz, neither "perform[ed] the acts which cause[d] the death" nor was convicted on a theory of murder which requires the actual, as opposed to the imputed, intent to kill. Yet that factor is specifically limited in its application to cases where "the murdered individual was *actually killed by the defendant and not by another party to the crime* or simply as a consequence of the crime" (emphasis added) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(a)), regardless of the nature of the underlying felony, or even the extent of the defendant's involvement in that felony or the intensity of his intention that the victim should die. It is significant that the third aggravating factor, which pertains to murders of two or more individuals, requires that the defendant have the "*intent* to kill more than one person" or that the deaths result from "separate *premeditated* acts" (emphasis added) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)), neither of which

conditions is met where the theory under which defendant was convicted permits his intent to be imputed. Not one aggravating factor pertains to defendants like Ruiz who do not do the actual killing and who must be prosecuted for murder under a theory such as accountability which allows the element of murderous intent to be supplied vicariously. The fact that the legislature specifically rejected or modified more inclusive forms of factors (6) and (3) in enacting the limiting provisos I have mentioned is strong evidence that it intended not to countenance so broad an application of the death penalty. See 1 H.R.J., 80th Ill. Gen. Ass'y, at 316-18 (1977) (factor (6)); 1 Legislative Synopsis & Dig., 80th Ill. Gen. Ass'y, at 955 (1977) (factor (3)).

The majority attempts to demonstrate a contrary intent by pointing to one of the mitigating factors set forth in subsection (c) of the murder statute. Its reasoning is that there would be no need to provide that absence during the commission of the acts causing death may be considered in mitigation (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)(5)) if accountability were not a basis for the imposition of the death penalty. This argument assumes that a defendant who is absent during the commission of the fatal acts cannot be charged with murder directly under the provision of the murder statute without resorting to accountability theories. I question the soundness of this assumption. As I have noted, one who solicits the killing of a victim does not do the actual killing; he need not be at the scene of the crime. Yet I see no reason why he cannot be prosecuted directly for murder. His intent to kill is real and need not be imputed; the act of soliciting another to perform the murder may well qualify as an "[act] which cause[s] the death" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)). In fact, as I have also noted above, the murder statute specifically allows the death penalty to be imposed on one who solicits the murder of another. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(5).) I fail to see why the mitigating factor relied on by the ma-

jority cannot apply to such a person, or why the factor must be construed as applying to persons merely accountable for the murderous acts of others in order to have meaning.

This court should not permit a person to be sentenced to death when all that it can determine is that there is a strong possibility, or even a probability, that the death penalty statute applies to his conduct. Our practice has been to interpret criminal statutes and punishment-enhancing provisions with lenity, and to resolve each and every ambiguity in the reach of such provisions in favor of the defendant. (See, *e.g., People v. Hobbs* (1981), 86 Ill. 2d 242; *People v. Haron* (1981), 85 Ill. 2d 261, 277-78; *People v. Lund* (1943), 382 Ill. 213, 215-16.) This practice should be followed with particular rigor in interpreting the death penalty statute, not only because of its severity but also because of its irrevocability. In this case the statute does not extend on its face to the grounds on which the defendant was convicted of murder, and further inquiry into the various aggravating and mitigating factors leaves room for considerable doubt as to whether the statute was ever intended to extend to those grounds. My interpretation is that such an intent did not exist. To the extent that this interpretation is disputable all doubts should be resolved in favor of the defendant. And inasmuch as the majority's attempt to make the death provision cover accountability cases depends on a labored construction of a mitigating factor which is probably not obvious to most laymen, the court should at the very least have given careful consideration to Ruiz' claim that the indictment did not sufficiently inform him that the death penalty would be sought, rather than dismissing it in two brief sentences as it did.

Traditionally, the courts of this State have adhered to the maxim that "[t]he degree of activity or participation in a crime should receive attention in fixing the sentence" (*People v. Colone* (1978), 56 Ill. App. 3d 1018, 1022; see

*People v. Viser* (1975), 62 Ill. 2d 568, 586-87; *People v. Morris* (1969), 43 Ill. 2d 124, 131; *People v. Parish* (1980), 82 Ill. App. 3d 1028, 1033-34; *People v. Mikel* (1979), 73 Ill. App. 3d 21, 32). Accountable accomplices have generally been given lesser sentences than principal perpetrators in accordance with this maxim, even though both are guilty of the crime. (See, *e.g., People v. Parish* (1980), 82 Ill. App. 3d 1028 (affirming disparate sentences because appellant was the principal perpetrator); *People v. Mikel* (1979), 73 Ill. App. 3d 21 (same); *People v. Colone* (1978), 56 Ill. App. 3d 1018 (reducing appellant's sentence because he was merely an accountable accomplice).) The evidence in this case shows that Ruiz not only did not stab any of the victims but specifically refused to do so. He had every right to expect, as a constitutional matter (*Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368) if not as a matter of prosecutorial choice, jury discretion (*Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978; *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909) or statutory interpretation that this refusal would make some difference in the punishment he would receive.

While Ruiz may not have been a "doormat" (*People v. Gleckler* (1980), 82 Ill. 2d 145, 164), neither was he a principal in the three murders for which the death penalty is being sought. I respectfully suggest that the majority should have considered this at greater length, both in exercising review of the sentence imposed in this case and in deciding whether the legislature, in enacting a capital punishment statute silent on its face regarding accountability, really intended to allow infliction of the ultimate penalty upon anyone but ultimate murderers. I would reverse the death sentence and remand for resentencing.