THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDDIE E. JOHNSON, Defendant-Appellant.

Fourth District   No. 4—87—0655

Opinion filed November 3, 1988.

Daniel D. Yuhas and Timothy M. Gabrielsen, both of State Appellate Defender's Office, of Springfield, for appellant.

Jeffrey K. Davison, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Linda Cullom, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On March 30, 1987, and April 9, 1987, defendant Eddie E. Johnson was charged in the circuit court of Macon County with the March 29, 1987, burglaries of eight motor vehicles. All of those burglaries were from automobiles parked in the "Wellington Way" and "Camelot Circle" apartment areas of Decatur, Illinois. Defendant was tried by jury on six of the eight counts, was convicted of five counts and was acquitted of one count. He was subsequently sentenced to five concurrent, extended terms of 10 years' imprisonment. On appeal, defendant maintains (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court abused its discretion in imposing a greater sentence on defendant than that given to his codefendants; (3) he is entitled to sentence credit for the amount of time he spent in jail in North Carolina pursuant to Illinois process before he was extradited to Illinois; and (4) he is entitled to a refund of certain fees imposed against him. We affirm.

At trial, police officer Michael Applegate testified that he interviewed defendant at 9:30 p.m. on March 30, 1987. He said that defendant gave Applegate an oral statement which was later reduced to writing and signed by defendant. Applegate then read the statement in which defendant said: (1) on March 29 and 30, 1987, between approximately 10 p.m. and 3:30 a.m., he was driving a Monte Carlo automobile; (2) in the car with him were Joe Williams, Adam Carney, and Bobby Warnsley; (3) he had been "told" these persons were going to commit car burglaries to obtain merchandise to be sold to obtain bond money for Joe Williams, who was going to turn himself in on an outstanding warrant; (4) they parked in the "Wellington Way" and "Camelot" apartment areas, and defendant gave Joe the keys to the car and trunk; (5) Williams, Carney, and Warnsley left defendant sitting in the car and later returned with various items and placed them in the trunk; (6) defendant did not actively participate in the burglaries; (7) the four returned with the merchandise to the trailer which defendant described as being his; (8) when the police arrived, Williams escaped through a bedroom window; and (9) defendant had been "told" they would split the money from the sale of the items. A copy of defendant's statement was admitted into evidence. The statement did not indicate who had "told" defendant car burglaries were to be committed or that the money obtained would be split.

The proof of defendant's guilt contained in the statement he purportedly made was corroborated by the testimony of Sherry Adams,

who lived at the "Wellington Way" apartments. Adams testified at trial that (1) on March 29, 1987, at approximately 11 p.m., she looked out of her apartment and noticed a car with lights flashing inside; (2) after a few minutes, she saw all four of the occupants of the car leave the car and run across the parking lot of the apartment complex; (3) she then went outside, wrote down the license number and returned to her apartment; and (4) after the four men returned to the car, she called the police, giving them the license number and a description of the car and the men's clothing. She described the car as a white Monte Carlo with a light blue vinyl roof.

The victims of the various burglaries also testified concerning the items which had been stolen, the damage to their vehicles, and the approximate time frame in which the burglaries had to have occurred. One victim, Harold Witts, testified that at approximately 11 p.m. on March 29, he saw two black men reaching into his fiancee's automobile. He said he yelled at them, called the police, and then went outside and pursued them on foot. He said he was unable to catch the men, but he observed the men leave in a Monte Carlo. He described the Monte Carlo as light blue with a white vinyl roof.

Police officer Henry Maxeiner testified that he was sent to the "Wellington Way" apartment complex, at which the Monte Carlo had first been seen. He said he talked to Adams and Witts at approximately 11 p.m. on March 29, obtained a description of a "maroon over white" Monte Carlo, and determined the address to which the Monte Carlo was registered. Officer Patrick Campbell testified that he was ordered to conduct surveillance of a trailer located at that address. He said when he arrived at the trailer, he waited for over an hour before a "white or light colored" Monte Carlo arrived. He said he could see the trunk and driver's side door open, and he could hear at least two voices. He called for assistance.

Police officer David Stewart testified that he went to the trailer at which Campbell had been conducting surveillance at approximately 4 a.m. on March 30, 1987. He said when he knocked on the door of the trailer, defendant answered and denied owning the trailer. He said when he asked defendant if the owner of the Monte Carlo was there, Kristie Hargrave came to the door. She eventually gave the officer permission to search the trailer. Stewart testified there were four persons in the trailer: defendant, Hargrave, Adam Carney, and Bobby Warnsley. He said he found a baseball bat, a tire iron, two radar detectors, a metal tool box, a cassette tape case, stereo speakers, and a screwdriver. He said he asked the people inside the trailer if any of the items belonged to them, and they all replied that they did

not. Stewart said he seized those items and a number of other items over which no one in the trailer acknowledged ownership. Stewart described People's exhibit Nos. 4 and 5 as photographs of radar detectors found in the trailer. He identified People's exhibit Nos. 6 and 7 as photographs of an "all-purpose box" found at the trailer. He then identified People's exhibit No. 8 as a photograph of a black vinyl cassette carrying case and People's exhibit No. 9 as a photograph of two car stereo speakers and a screwdriver, all of which were found in the trailer.

Jeffrey Alexander testified at trial that he lived at the Camelot Apartments, and at 9:50 a.m. on March 30, 1987, he discovered his automobile, which had been parked in the apartment complex lot, had been broken into. He said a tool box was missing from the car and identified People's exhibit Nos. 6 and 7 as photographs of his tool box.

Jo Ellen Dellert, also of Camelot Apartments, testified her automobile had been parked at the apartment complex and had been entered sometime between 10:30 p.m. on March 29 and 8 a.m. on March 30. She identified People's exhibit No. 5 as a photograph of a radar detector taken from her vehicle at that time.

Abbi Walter, another resident of the Camelot Apartments, testified that she discovered her automobile had been entered without her permission between 7 p.m. on March 29 and 8 a.m. on March 30, 1987, in the apartment complex parking lot. She said stereo speakers, a jacket, and some cassettes in a case were missing. She identified People's exhibit No. 8 as a cassette carrying case that was removed from her vehicle. She said she did not recover the jacket or the speakers.

Tim Phelps testified he lived at the Wellington Way Apartments, and that at 5:30 a.m. on March 30, 1987, he noticed his car, which had been parked in the apartment parking lot, had been broken into. He identified People's exhibit No. 4 as a photograph of a radar detector that had been removed from his vehicle without his permission.

Darrin Maddox testified that he lived at the "Camelot Apartments—or Yorkshire Apartments" on March 30, 1987. He said his car was entered between 11 p.m. on March 29 and 6:30 p.m. on March 30, 1987, in the apartment parking lot. He identified People's exhibit No. 9 as a photograph of two stereo speakers and a screwdriver that were taken from his vehicle.

Adam Carney was called as the only defense witness. He testified he was presently incarcerated and was currently charged with

criminal conduct in the form of automobile burglaries committed on March 29, 1987. He refused to testify further on constitutional grounds.

The jury acquitted defendant of the charge of burglary to the Witts automobile, but it convicted him of five other counts of burglary to a motor vehicle. Evidence had been presented that an item from each of those vehicles was later found in the trailer where defendant was found by Officer Stewart. Defendant maintains he was not proved guilty beyond a reasonable doubt of the five burglaries, because he was tried on accountability principles, and the State failed to adduce proof that he was present during the commission of the burglaries or that he aided or abetted their commission. Defendant notes that Officer Applegate failed to receive a description from defendant of the vehicles burglarized and failed to attribute to defendant any mention of a burglary at the "Yorkshire Apartments" that same evening.

Section 5—2 of the Criminal Code of 1961 provides that a person is legally accountable for the conduct of another when:

> "(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).

Defendant cites *People v. Ware* (1980), 82 Ill. App. 3d 297, 402 N.E.2d 762, where a defendant's conviction of murder was reversed on appeal on the ground that he had not been proved guilty beyond a reasonable doubt. There, the State relied on testimony that Ware was in the vicinity of the residence in which the deceased was killed a short time before the murder was committed. In addition, Ware's fingerprint was found on a glass in the residence after the deceased's body was found. The appellate court noted that the evidence did not exclude the possibility that the fingerprint may have been impressed at a time unrelated to the crime, and since the exact time of death was not established, defendant's guilt was not proved beyond a reasonable doubt.

Here, however, evidence was presented of a statement in which defendant admitted the burglaries occurred between 10 p.m. on March 29, and 3:30 a.m. on March 30, thus within a time testified by the victims as that in which their vehicles could have been burglarized. In that statement, defendant also admitted he drove three others to the Wellington Way area and Camelot Apartment area knowing that the other three intended to commit burglaries there, and

after they did so, drove them to the trailer. Activity of that nature, committed with that mental state, is sufficient to allow a jury to find an accused guilty on a theory of accountability. (*People v. Ruiz* (1982), 94 Ill. 2d 245, 254, 447 N.E.2d 148, 151, *cert. denied* (1983), 462 U.S. 1112, 77 L. Ed. 2d 1341, 103 S. Ct. 2465; *People v. Barber* (1981), 93 Ill. App. 3d 911, 418 N.E.2d 439.) In *Ruiz*, the court found evidence that the defendant " 'voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that [the defendant] shared the common purpose.' " (*Ruiz*, 94 Ill. 2d at 254, 447 N.E.2d at 151, quoting *People v. Rybka* (1959), 16 Ill. 2d 394, 405, 158 N.E.2d 17, 22.) In *Barber*, there was evidence the defendant was the driver of a car, picked up two other men before the commission of the offense, waited in the parking lot while the offense was being attempted, left with the other men afterward, and dropped them off at another car. This court held such evidence to be sufficient for a jury to have found the defendant guilty on a theory of accountability.

Victims of each of the alleged burglaries upon which convictions were obtained testified that a photograph of an item found in the trailer portrayed an item taken from their respective burglarized vehicles. Evidence was also presented that defendant was actually an active participant in several of the burglaries. Sherry Adams testified that all four of the occupants of the Monte Carlo left the vehicle as a group rather than, as defendant indicated, that he remained in the car while the others committed the burglaries.

As to defendant's contention that he was not proved guilty beyond a reasonable doubt because the police officers failed to receive from him a description of any of the vehicles which were burglarized, we note first that, in his statement, defendant denied his active participation in the burglaries. If this were so, he would not necessarily have known the descriptions. As we have explained, the circumstantial evidence was strong that the various burglaries testified to by the victims were committed by the persons driven by defendant and he knew of their intent. The jury needed only to find that defendant, in intending to promote or facilitate the commission of the offense, aided, abetted, or agreed or attempted to aid another in the planning or commission of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2(c).) The State did not have to prove defendant's knowledge of every detail of the crimes.

Defendant's contention the State's proof was insufficient because defendant's statement made no reference to any burglary occurring at the Yorkshire Apartments apparently arose from Maddox' testi-

mony that he lived at "the Camelot or Yorkshire Apartments." Defendant's statement did refer to burglaries occurring at the area of the Camelot Apartments. Maddox' testimony would indicate that the Camelot and Yorkshire Apartments were one and the same, part of the same complex, or in the same area. Sufficient connection was shown between the burglary described by Maddox and the burglaries described in defendant's statement.

Finally, defendant contends the stolen items found at his trailer cannot be said to have been in his exclusive control and, therefore, the jury could not have properly inferred his guilt in the burglaries based on the possession as allowed by *People v. Housby* (1981), 84 Ill. 2d 415, 420 N.E.2d 151, *cert. denied* (1981), 454 U.S. 845, 70 L. Ed. 2d 131, 102 S. Ct. 160. *Housby* allows a jury to infer guilt from a defendant's exclusive possession of recently stolen property if (1) there is a rational connection between the possession and the defendant's participation in the burglary; (2) the defendant's guilt of burglary is more likely than not to flow from the possession; and (3) there is evidence that corroborates the guilt. *Housby*, 84 Ill. at 424, 420 N.E.2d at 155.

Here, defendant admitted the burglaries occurred between 10 p.m. on March 29 and 3:30 a.m. on March 30. Officer David Stewart testified that he knocked on the door of defendant's trailer at approximately 4 a.m. on March 30 and found items possibly used in committing burglaries to motor vehicles and a number of items later identified by the victims as having been stolen from their vehicles in the late night and early morning hours of March 29 and 30.

In the written statement of the defendant, read into evidence, defendant described the trailer as "his." Yet, Officer Stewart testified that when he entered the trailer, he questioned the occupants as to who owned the trailer, and defendant denied ownership. However, the others also denied ownership, and the evidence indicated defendant had as much possession as others present. Joint possession with others can be "exclusive" for purposes of the *Housby* inference. (*People v. Ross* (1981), 103 Ill. App. 3d 883, 431 N.E.2d 1288.) Any possession which defendant had was unexplained except to the extent that the circumstances indicated it had been obtained from the burglaries.

While the existence of the *Housby* inference would be helpful to the State's case, it is in no way dependent upon the existence of the inference. No issue is raised concerning the giving of the *Housby* instruction. (Illinois Pattern Jury Instructions, Criminal, No. 13.21, Committee Note, at 295 (2d ed. 1981).) The State's case is based on

the evidence of admissions by the defendant and the corroborating circumstantial evidence.

The jury's function is to determine the credibility of the witnesses, the weight to be given their testimony, and inferences to be drawn therefrom. The jury's determination of guilt should not be disturbed on review where, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267.) The evidence presented here was sufficient to support defendant's convictions.

Defendant's next contention is that the trial court abused its discretion in sentencing defendant to extended terms of imprisonment of 10 years where a codefendant, who pleaded guilty to a reduced charge, was sentenced to 18 months' intensive probation with the condition he serve 30 days in jail. Defendant notes the men participated to the same extent in the offenses charged, and he argues the discrepancies in their criminal records and previous conduct did not justify the "gross disparity."

■■ Although fundamental fairness requires that defendants similarly situated, with like potential for rehabilitation, and who are guilty of similar offenses, receive similar sentences (*People v. Broom* (1977), 48 Ill. App. 3d 994, 995, 363 N.E.2d 635, 636), different sentences are proper where there is a basis for the distinction. (*People v. Prater* (1973), 12 Ill. App. 3d 452, 453, 299 N.E.2d 26, 27-28.) Disparate sentences may be supported by a more serious criminal record. *People v. Martin* (1980), 81 Ill. App. 3d 238, 245, 401 N.E.2d 13, 18.

■■ Comparing defendant's prior criminal record with that of Bobby Warnsley, we note that defendant had an extensive criminal record both as a juvenile and as an adult. Bobby Warnsley had no juvenile record and only two major convictions as an adult. His adult record consisted of a speeding violation, a felony theft conviction, and convictions for illegal possession of alcohol and firearms. Adam Carney had no juvenile or adult convictions, and defendant does not argue his sentence should be compared to Carney's.

Defendant, on the other hand, was convicted as a juvenile for aggravated assault, and his adult record consisted of convictions in 1985 for theft, reckless driving, and two charges of criminal trespass to a motor vehicle. In all cases he was either fined or placed on a

period of probation. In 1986, defendant was convicted of theft, criminal trespass to land, theft of property valued in excess of $300, and unlawful use of weapons. He was sentenced to a period of 25 days in jail for the theft conviction and to periods of two years' and four years' imprisonment for the felony theft and unlawful use of weapons convictions, respectively. The instant offense was committed while he had been released on bond pending appeal of other convictions. After conviction, he fled the jurisdiction but was captured and returned for sentencing.

A further factor explains the difference in sentencing. Warnsley was sentenced pursuant to a plea agreement whereby he pleaded guilty to only one charge of burglary. Defendant, on the other hand, was convicted of five burglaries. Defendant's prior felony convictions were properly used to impose an extended sentence pursuant to section 5—8—2(a)(4) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2(a)(4)). Warnsley was not eligible for an extended-term sentence.

■ Defendant next maintains he is entitled to sentence credit for the amount of time he spent in a jail in North Carolina pursuant to Illinois process before he was extradited to Illinois.

On August 13, 1987, after sentencing, the court asked counsel the amount of sentence credit to which the defendant would be entitled. The parties agreed that defendant had been arrested for the present offenses on March 31, 1987, and was released on April 1. Counsel also indicated defendant fled to North Carolina after his trial, where he was taken into custody for the State of Illinois on an Illinois warrant. A Macon County sheriff's deputy stated defendant was in custody of Macon County authorities upon his return to the county August 8, 1987. The court found defendant was entitled to six days' credit from August 8 to August 13 and two days for March 31 and April 1, for a total of eight days' credit. He gave no credit for the time defendant was in custody in North Carolina.

The parties agree that a defendant, confined in a foreign State by reason of an Illinois process, is entitled, upon conviction, to sentence credit for time confined in the foreign State. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—7(b); *People ex rel. Bradley v. Davies* (1974), 17 Ill. App. 3d 920, 309 N.E.2d 82.) However, here, the record does not indicate an error occurred in the calculation of sentence credit. No evidence was presented to the court at sentencing as to how long defendant was held in North Carolina, nor was any credit requested for that time. The record contains no copy of any other document showing the length of defendant's incarceration there and

we have no proper basis for awarding any more credit.

■ Finally, defendant maintains he is entitled to a refund of a $550 extradition fee and a $478.40 court reporter's fee, which were taxed as costs. He argues the trial court was without statutory authority to assess the costs of extradition against him and that the trial court was without jurisdiction to enter the order of January 21, 1988, in which it ordered that defendant's bond deposit be applied to the cost of the production of the trial transcript. The court entered the order assessing costs against defendant at his sentencing hearing on August 13, 1987.

At the time the court entered the order assessing costs of extradition against defendant, the statutory provision providing for the recovery of costs indicated:

"When any person is convicted of an offense under any statute, or at common law, the court shall enter judgment that the offender pay the costs of the prosecution." (Ill. Rev. Stat. 1987, ch. 38, par. 180—3.)

The Fifth District Appellate Court has noted that statutory provisions allowing the recovery of costs must be strictly construed (*People v. Nicholls* (1978), 71 Ill. 2d 166, 173, 374 N.E.2d 194, 197) and has concluded that extradition expenses could not be imposed upon a defendant as costs of the prosecution. *People v. Bratcher* (1986), 149 Ill. App. 3d 425, 433, 500 N.E.2d 954, 959.

That statute has been amended, however, to allow the costs of extradition to be assessed against the defendant. The primary function of a court, in construing a statute, is to give effect to the intent of the legislature. (*People v. Beam* (1979), 74 Ill. 2d 240, 384 N.E.2d 1315.) In doing so, it is proper to consider both the history of the legislation as well as subsequent amendments. *Western National Bank v. Village of Kildeer* (1960), 19 Ill. 2d 342, 354, 167 N.E.2d 169, 175.

Here, the senator who introduced the bill described it as being in response to an appellate court ruling, presumably *Bratcher*, that the State was not entitled to extradition expenses. The senator indicated the legislature assumed those costs were assessable against the defendant. (85th Ill. Gen. Assem., House Proceedings, June 9, 1987, at 14.) Thus, based on the amendment and the stated intent of the legislature, it is clear the legislature felt the *Bratcher* court had misinterpreted the statute. Where, as here, the legislative history indicated that the legislature amended existing legislation to give it the construction which it deemed to have originally been intended and the amendment related only to matters of procedure, it should be ap-

plied retroactively. (*In re Pronger* (1987), 118 Ill. 2d 512, 521, 517 N.E.2d 1076, 1079.) We deem the assessment of additional costs to be predominantly a procedural matter, although their assessment does create an additional liability upon the party charged. We conclude the trial court properly assessed the costs of extradition against defendant.

As to the cost of producing the transcript, we note that the court informed defendant that the transcript of the evidence would be provided to him free of charge "upon proof" of his indigency. The docket entry at the time defendant filed his notice of appeal noted there was "no showing" that defendant was indigent. Thus, defendant cannot now complain that the transcript should have been furnished free of charge. Nevertheless, defendant contends that although the order assessing costs against him was entered at sentencing, when the court clearly had jurisdiction, the exact amount of the costs for the transcript was determined after defendant had filed notice of appeal, and the court had thus lost jurisdiction. While defendant had filed notice of appeal before the amount of those costs were finally determined, the court had not lost jurisdiction to determine the amount of costs. A court retains jurisdiction to fix costs after it has lost jurisdiction for all other purposes. *Bettenhausen v. Guenther* (1944), 388 Ill. 487, 490, 58 N.E.2d 550, 552.

We hold that the court had not lost jurisdiction to make a determination of the exact amount of the costs attributable to furnishing the transcript after notice of appeal was filed. Any other rule would be unworkable, because the amount due for a transcript of the evidence cannot be fixed until the transcript is complete. Except in cases where reporters are alternated and "instant copy" is obtained, court reporters are unlikely to be able to finish a transcript before notice of appeal is filed.

For the reasons stated, the decision of the trial court is affirmed.

Affirmed.

McCULLOUGH and SPITZ, JJ., concur.