(Nos. 38727, 39360, 39446 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK YONDER, Plaintiff in Error.—THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* NICHOLAS GUIDO, Plaintiff in Error.

*Opinion filed May 28, 1969.—Rehearing denied March 23, 1970.*

SCHAEFER and WARD, JJ., took no part.

BERNARD J. NUSSBAUM and MICHAEL M. LYONS, both of Chicago, (SONNENSCHEIN, LEVINSON, CARLIN, NATH & ROSENTHAL, and STANLEY J. ADELMAN, of counsel,) appointed by the court, for plaintiff in error Frank Yonder.

JAMES P. CHAPMAN, of Chicago, appointed by the court, for plaintiff in error Nicholas Guido.

WILLIAM G. CLARK, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE, HOWARD LEVIN, and THEODORE A. SHAPERO, Assistant State's Attorneys, of counsel, ) for the People.

Mr. JUSTICE HOUSE delivered the opinion of the court:

The defendants, Frank Yonder and Nicholas Guido, were tried before a jury for the crime of armed robbery, found guilty and sentenced to a term of not less than 60 nor more than 100 years in the penitentiary. The cause is now before us on appeal. The defendant Nicholas Guido appeals from his conviction and also from the denial of a petition which he filed under the Post-Conviction Hearing Act. The two appeals of Nicholas Guido were consolidated and will be considered together with the separate appeal of Frank Yonder in this opinion.

The indictment charged that the defendants, together with Louis Vasselli, Duane Pinkowski and Patricia Guido, while armed with a pistol, took money and jewelry from the person and presence of Joan Botthof at her home located in Winnetka. Duane Pinkowski and Patricia Guido, the wife of defendant Nicholas Guido, agreed to testify for the State, and their testimony along with other witnesses revealed the following facts.

The defendants obtained a set of keys to the Botthof home from a "car-hiker" at the Kay-Den Beauty Shop located near Guido's apartment in Chicago. After receiving the keys, and having them duplicated, Nick and Patricia Guido gave the duplicates to Yonder with instructions to visit the home and find out if the keys worked. Yonder made the visit and reported that the keys opened the doors of the home.

Guido contacted Duane Pinkowski on May 24, 1962, and requested he come to his apartment for a meeting. A short time after Pinkowski arrived, Patricia Guido and Yonder, accompanied by Pinkowski, made another visit to the Botthof home and, after pointing out the house to Pinkowski, drove around the neighborhood while Yonder explained the details of the robbery planned by Guido.

On May 25, 1962, Yonder and Vasselli met in a tavern where Guido informed Vasselli of the planned robbery and asked him if he wanted to take part in it. Vasselli agreed. Guido told Vasselli that Yonder would be the leader in the house and that Vasselli had only to bring the guns.

On Saturday, May 26, 1962, Nick and Pat Guido went shopping for the necessary articles to carry out the robbery. They first visited a discount store where Guido purchased a flashlight and stocking cap, and from there went to a nearby dime store where he purchased a rope and flashlights. They then proceeded to a Neumode Hosiery store, where defendant Guido sent Pat Guido in to purchase two pairs of large white nylons which were later cut and made into masks. The final store they entered was a Walgreen Drug store where Guido bought two large rolls of wide adhesive tape. After acquiring these articles, they returned to the apartment, stopping along the way at John Seicchitano's hot-dog stand where Guido obtained a gun and a set of master keys for General Motors automobiles.

On Sunday, May 27, 1962, Yonder, Vasselli and Pat Guido drove to the Lake Forest Oasis on the Northwest tollway where the defendant Yonder went into a phone booth and copied the telephone number. Later that evening, Yonder, Guido and Pat Guido met Vasselli for the purpose of stealing a car that could be used in the robbery. Yonder and Vasselli, under Guido's supervision, obtained the car from a used car lot. The robbery of the Botthof home was then performed by Yonder, Vasselli and Pinkowski while Patricia and Nick Guido waited at a restaurant. They later

met Yonder at their apartment. Yonder's suit was splattered with blood, and he was very excited. He told Guido that he had left the Butthof family for dead and that they were only able to get $130, two pairs of pearls and a ring. While Yonder cleaned up and changed clothes, Guido told Pat Guido to take Yonder's clothes and throw them in an alley where they would not be found. When Pat Guido returned to the apartment Guido gave her the pearls and his gun and told her to drive Yonder to her house in Joliet. Pat Guido left Yonder asleep in her home, hid the articles in the basement and returned to the apartment in Chicago to pick up Guido.

On May 29, 1962, Guido moved out of his apartment and returned to Joliet with Pat Guido. About a week after the robbery took place, Guido removed the pearls from their hiding place in the basement, placed them in a cannister and buried them in the back yard of the premises. Between May 28, 1962, and June 18, 1962, Pat Guido was with Guido every day. On June 18, 1962, the police visited the Guido home in search of Guido and Yonder. Neither was present, but Pat Guido, subsequent to the police visit, received three telephone calls from the defendants. After receiving the last call, Pat Guido contacted the Joliet police and, in the presence of the State's Attorney's police, sheriff's police and Joliet police, unearthed the cannister containing the stolen property. After turning the cannister over to the police, Pat Guido was arrested and charged with taking part in the Botthof robbery. She was subsequently released on bond but, at her request two days later, was placed in protective custody by the State's Attorney's office. She remained in protective custody until the trial.

Pinkowski agreed to testify for the State. He admitted that in exchange for his testimony the State's Attorney's office had given him a written promise that the charges pending against him for his participation in the offense would be dismissed.

Pinkowski testified that Yonder, Vasselli and he drove to the vicinity of the Botthof house in a stolen blue Pontiac. They parked the car and entered the house, using the duplicate key. During the robbery, Yonder beat Botthof on the chest, kicked him and slapped him with his pistol and gouged his eyes with his thumb. Mrs. Botthof was kicked and severely burned, as were the maids in the household, by Yonder placing lighted cigarettes and matches to their breasts, pubic hairs and bodies. The young son of the Botthofs was also attacked by Yonder who twisted the boy's arms. All of this was done in an effort to get the Botthofs to tell Yonder where the jewelry was and the money he assumed was present in the house. As Yonder, Pinkowski and Vasselli started to leave the home, Yonder wanted to return to the bedroom where the victims had been bound and kill all of them. Pinkowski, however, persuaded Yonder to leave them alone and the three left the Botthof residence, taking with them Mrs. Botthof's pearl necklace, ring and $135 in cash.

Guido, who took the stand on his own behalf, denied any knowledge of, or participation in, the commission of the robbery or its planning. He explained that he fled from the State because he feared for his life under a shoot on sight order which had been issued by the authorities. Yonder did not testify.

Botthof testified in part that in the early morning of May 28, 1962, he was awakened by a blow over his right eye. He told how he was struck three times in the eye; how the "men" dragged the two maids from their rooms; how the men bound Mrs. Botthof, the two maids and his 11-year-old son with adhesive tape; how the "tall man" poked his thumb "as hard as he could" six times into Botthof's eye (causing loss of sight) and pounded Botthof's chest with his fists, kicked him several times in the ribs, (breaking two of them), and slammed the heel of his shoe into Botthof's face; that the "tall man" proposed that they rape the women

and said "I'm going to have a sex orgy with your son"; that one of the men struck Mrs. Botthof on the side of the head and said, "Bring the bitch over and let her see the old man"; that Mrs. Botthof was then dragged by her hair across the floor to look at her husband; and that the men then burned the pubic hairs of the three women.

Mrs. Botthof testified in part that early in the morning of May 28, 1962, she was awakened when "my husband was struck with a gun butt over his left eye"; that the men bound her and the others, including her young son, with tape; that the "tall man beat my husband unmercifully" and "took his thumb and drove it into my husband's eye as far back as he could" and "kicked my husband and stood on his face"; that one of the men "let me have it with his fist and he stood on my neck three times"; that one of the men said "I will have to cut the bitch's finger off" when they had difficulty removing her wedding ring; that "during all this, my two maids were being beaten, one had her eye gouged with a finger" and "then one maid had her jaw almost broken and a huge bruise on her breast"; that the "tall man said, 'Very well, light the women.' So the stocky man struck matches and lighted the pubic hairs of the women, and * * * they had stripped our clothes off, all off, we were lying naked, and we were on our backs, and I leaned over, I rolled over and put this blaze out on the leg of Pinkoski [a maid]. I had no hands, and I couldn't just let it blaze"; that "the 'tall man' ordered the women to be raped * * *; Then he was going to have a sex orgy with my little son, saying 'Have you ever seen a sex orgy?' "; and that the beating just continued.

A pretrial competency hearing was held before a jury to determine if Yonder was competent to stand trial. Following testimony by experts on both sides and friends of the defendant, he was found sane and competent to be tried for his alleged crime.

During the competency hearing, the trial court gave the

following instruction: "The Court instructs the jury that a person is presumed to be sane until the contrary is shown. Once evidence tending to show insanity is introduced then the State has the burden of proving by the preponderance or greater weight of the evidence that the petitioner is sane." Defendant claims that this instruction confused the jury by improperly stating that he had the burden of proving his insanity.

If we were to read only the first sentence of the instruction, then the defendant's assertion would be correct. However, when the instruction as a whole is considered, the mention of the presumption of sanity is at most harmless error. The presumption, as stated, in this instruction, is that all persons are sane and personally responsible for their acts until insanity is made to appear by the evidence. When such evidence is introduced, then the presumption of sanity ceases and the prosecution must prove the sanity of the accused by a preponderance of the evidence. *People* v. *Bender*, 20 Ill.2d 45.

Yonder also maintains that he was not proved sane beyond a reasonable doubt at the trial. His sanity and the amount of proof thereof was a question for the jury (*People* v. *Le May*, 35 Ill.2d 208) which was present and heard the conflicting expert and lay testimony presented by both sides and then resolved the conflict by a finding of sanity. We have reviewed this testimony and are of the opinion that the defendant was proved sane beyond a reasonable doubt at the time of the crime and during trial and that the jury was correct in so finding. *People* v. *Myers*, 35 Ill.2d 311.

During the trial, the court refused to allow the expert witnesses to give direct opinions upon Yonder's sanity at the time of the alleged crime. The defendant Yonder argues that the trial court erred in so doing and that the hypothetical questions asked of the State's expert witnesses were improper. It is our opinion that the trial court's ruling

was not prejudicial error. The ruling applied to both parties, and since the State had the burden of proof, the ruling was to the defendant's advantage.

Yonder claims that the prosecution included in its hypothetical questions the facts and statements attending the offense but omitted his history and other symptoms of insanity which were put in evidence and that the failure to include all of the evidence when asking the questions was improper and a violation of due process. In our opinion, Yonder has failed to consider that the factual evidence presented to prove insanity was controverted and at issue as well as that presented to prove sanity. In asking a hypothetical question, a party may include only proved facts. (*People* v. *Heissler,* 338 Ill. 596.) Thus, the prosecution was not bound to include all of the evidence upon the issue in its hypothetical questions, but could include only proved facts favorable to its allegation of sanity. After a careful review of the hypothetical questions asked by both parties upon direct and cross-examination, we are of the opinion that there was no denial of due process or a fair trial.

Yonder's final contention concerning the sanity issue is that the trial court's instructions and verdict forms on the issue of sanity were improper. Yonder contended that he was insane at both the time of the crime and at trial, but now argues that the instructions and verdict forms given to the jury should have contained statements that he was insane at the time of the crime but had recovered by the time of trial. Three verdict forms were prepared and instructions given containing the defendant's theory, the State's theory and the theory of innocence. The form now contended for by defendant does not conform to any of these theories. Because no evidence of defendant's recovery was presented, the lack of this theory is justified and not erroneous, and when considered as a whole, the instructions and verdict forms on the sanity issue were proper.

Both Yonder and Guido maintain that they were entitled

to separate trials, and that the trial court's failure to grant their motions for severance deprived them of a fair trial and denied Guido the right to call Yonder as a witness. The granting of a separate trial is not a matter of right but falls within the sound discretion of the trial court which must consider whether the defenses of those being jointly tried are so antagonistic that a fair trial can be had only by severance. (*People* v. *Earl,* 34 Ill.2d 11.) In reviewing the trial court's decision on this issue, we will look only to the petitions filed by the defendants and the matters alleged therein, and not to the subsequent happenings at trial. The petitions allege that each defendant will incriminate the other, that Yonder's admission of guilt but allegation of insanity will dilute Guido's defense of innocence, that Guido will not be able to put Yonder on the stand as a witness on Guido's behalf so that he may be exculpated, and that the jury will be allowed to hear inadmissible and inflammatory evidence concerning Yonder's conduct during the robbery. It is our opinion that the above allegations were mere apprehensions and that the trial court did not abuse its discretion in denying the defendants' motions for severance.

Defendants also allege that the pretrial publicity which permeated the Chicago area during the six-month period prior to trial was prejudicial, and along with the trial court's refusal to grant their motion for a change of venue or to sequester the jury, deprived them of a fair trial. Yonder never filed a formal motion for change of venue. Guido filed his motion, to which the State filed an answer, alleging in part that Guido encouraged and contributed to the publicity surrounding his trial. Following his capture, Guido proclaimed his innocence to newsmen during interviews. One reporter described Guido as "busy scribbling notes since his arrest," which provided material for more news stories. He called the Chicago Daily News from jail, sent a love letter addressed to his wife to a Chicago Tribune Reporter, and co-operated with television newsmen during the filming of

several interviews. We also note that Guido did not timely file his motion for change of venue. At the time the motion was presented, the trial court had held a competency hearing, had heard motions for severance, for continuance, to suppress evidence and to change judges. Such a motion which is filed after the trial court has ruled on matters going to the merits of the case comes too late. *People* v. *Berry,* 37 Ill.2d 329.

The defendants complain primarily about pretrial publicity, the effect of which can be determined by looking at the *voir dire* where every prospective juror who had formed an opinion as to the guilt of the defendant was excluded by the trial judge, and none of the jurors finally accepted were challenged for cause. As the Supreme Court of the United States stated in *Beck* v. *Washington,* 369 U.S. 541, 558, 8 L. Ed. 2d 98, 112, 82 S. Ct. 955, "The fact that petitioner did not challenge for cause any of the jurors so selected is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt." The *voir dire* transcript establishes that 44 of the 111 veniremen had not seen any pretrial publicity and that 54 were not specifically questioned on this point. In regard to publicity during the trial, the record shows that the trial court guarded the defendants' rights by repeatedly admonishing the jury not to discuss the case with anyone, read newspapers, listen to the radio, or watch television and by inquiring every day whether they had done so.

The trial court declined to sequester the jury, which was within its discretion, and defendants claim this decision was reversible error, citing *Sheppard* v. *Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507. If there are adequate warnings given by the trial court and no demonstration of actual prejudice by the defendants, then the failure to sequester is not reversible error. (*People* v. *Berry,* 37 Ill.2d 329.) The trial judge in this case diligently admonished the jury at each recess and questioned them when the trial

resumed. He repeatedly emphasized their duties as jurors and the importance of following his orders. Our basic consideration here is not necessarily the correctness of the trial court's rulings on the defendants' motions for change of venue and sequestration or the amount of publicity involved, but whether upon the record as a whole the defendants received a trial before a fair and impartial jury since these rulings were proper if defendants actually received such a trial. (See *People* v. *Speck,* 41 Ill.2d 177.) We are satisfied, from a review of the record, that the defendants did receive a trial before a fair and impartial jury and that the trial court did not err in denying their motions for change of venue and to sequester the jury.

When defendant Guido was returned to Chicago following his arrest, he met with Assistant State's Attorneys Garippo and Flynn. At that time, he asked whether the State had made a "deal" with his wife, Pat. He was told that no deal had been made, but if such occurred he would find out about it. Guido now argues that the State failed to disclose to him any arrangement it made with Pat Guido's attorney prior to her appearance in court and that this omission violated the State's agreement and constitutional duty to disclose to a defendant evidence favorable to his cause as required by *Brady* v. *Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. The Supreme Court in the *Brady* decision stated: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (373 U.S. at 87, 10 L. Ed. 2d at 218.) The State claims that it was under no obligation to inform the defendant of the existence of its understanding with Pat Guido's attorney since Pat Guido had no personal knowledge of the agreement prior to testifying as a witness for the prosecution which could have influ-

enced her testimony, and in the absence of such knowledge on her part, no prejudice resulted to the defendant Guido since disclosure of the deal could not have aided in his defense.

From an examination of the record, it is evident that Pat Guido had no knowledge of a specific deal between her attorney and the prosecution, nor is there any definite evidence that her testimony and cooperation was induced by promises or expectations of leniency. The prosecution testified that no promise was ever made to Pat Guido, one of the reasons being she had never asked about it; that there was never any discussion with Pat Guido about the disposition of the charges pending against her; that later, when an agreement was made with her attorney, it was specifically provided that she was not to know about it, and that her sole interest from the time she went to the police was being protected from her husband, his brothers and the relatives of other defendants.

Guido argues that the prosecution made a positive promise to disclose to him any deals made with his wife or Duane Pinkowski. There was a disclosure of the deal with Pinkowski. Assuming an agreement was made with his wife, the breaking of the alleged promise to defendant Guido does not constitute reversible error as a basis for appeal since proof of such a promise is lacking and its enforceability questionable.

It is our opinion that the existence of the above facts does not necessitate a disclosure of the deal made by the prosecution with Pat Guido's attorney. The *Brady* doctrine finds application only where the defense counsel is hampered in preparing an effective defense by the suppression of evidence favorable to that defense. Since the defendant in this cas was apparently convinced that a deal had been made as evidenced by the continuous specific questioning of the witnesses, and recognizing that the witness possessed no knowl-

edge of such a deal so as to influence her testimony, there was no suppression of evidence beneficial to Guido's preparation of his case.

Defendant Guido's next argument concerns the introduction of evidence that he was the leader of the torture-robbery gang and that he had committed other crimes. He argues that the above and other improper evidence about the "key scheme" was prejudicial because of its implication that the "Guido gang" had committed a series of torture robberies with each of the house keys obtained from the doorman at the Kay-Den salon. Regardless of this implication, evidence that keys other than the one used to enter the Botthof home were stolen was admissible since it established a scheme or design which was similar to the offense charged in the indictment. Although evidence of other crimes is generally inadmissible, this same evidence is proper when it tends to prove design, motive or knowledge on the part of the defendant. *People* v. *Tranowski,* 20 Ill.2d 11.

During cross-examination by the prosecution, Guido was asked about his source of income and certain expenditures he had made about the time of the Botthof robbery. He now claims that such questioning constitutes reversible error since its only purpose was to show that his expenditures exceeded his income and that the excess was derived from criminal acts such as the robbery of other Kay-Den patrons pursuant to the "key scheme". Since Guido's own counsel inquired about his income several times upon direct examination, and in view of the great latitude allowed in the cross-examination of witnesses (see *People* v. *DuLong,* 33 Ill.2d 140), we are of the opinion that the questions about the defendant Guido's income were proper.

We next consider defendant Guido's contention relating to the introduction of evidence that Pat Guido was in protective custody. During direct examination by the prosecution, when asked "Where is your residence?" Pat Guido replied that she was in protective custody, which response was

stricken by the trial court. It is clear that Pat Guido's answer was not responsive to or called for by the question, and as such is not reversible error. (*People* v. *Naujokas,* 25 Ill.2d 32.) Guido also objects to certain questions in response to which Pat Guido explained how she happened to be in the custody of the State's Attorney's office, how she was moved from motel to motel and that during such time she voluntarily remained in custody. We are of the opinion that these questions were proper as determined by the trial court, and if any prejudicial inference were created, it could have been dispelled upon cross-examination.

Defendant Guido's next argument concerns improper repetition of defendant Yonder's torture conduct and improper corroboration of Pat Guido's testimony. The prosecution introduced three witnesses whose testimony described the Botthof robbery and torture by Yonder. There is no doubt that this evidence aroused feelings of horror and indigation in the jury, however, it should not be excluded on that ground alone. Any evidence about the details of a violent crime may cause such feelings and this tendency does not render such testimony incompetent. (*People* v. *Jenko,* 410 Ill. 478.) Nor is the fact that three people testified about the crime a basis for reversal in view of the requirement of proof of guilt beyond a reasonable doubt. We will not require a party to weaken his case to avoid a minimum of repetition.

Defendant Guido also claims that the prosecution committed reversible error by calling five witnesses to corroborate the testimony of Pinkowski and Pat Guido, since none of the five gave testimony of probative value and completely failed to corroborate such testimony. This is a matter for the jury to decide and we will not interfere since the uncorroborated testimony of a single accomplice is sufficient to convict if the jury is satisfied of guilt beyond a reasonable doubt.

We find no reversible error in Guido's two remaining

arguments concerning the introduction into evidence of two hacksaw blades which he had hidden in his shoe while in jail and the testimony of one witness that certain keys were found in Guido's possession when arrested. The keys were not admitted into evidence, and the judge instructed the jury to ignore all reference to them. Also, the rule that evidence of an escape or attempted escape from custody by a defendant is competent as proof of a presumption of guilt of the crime charged (*People* v. *Gambino,* 12 Ill.2d 29) could be fairly extended to cover the present case where the defendant had the means of escape hidden in his shoe.

We are convinced that there is no reasonable doubt as to the guilt of defendants Guido and Yonder, and finding no error in the record requiring reversal, the judgments of the circuit court of Cook County are affirmed.

*Judgments affirmed.*

SCHAEFER and WARD, JJ., took no part in the consideration or decision of this case.