THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALAN R. TAYLOR, Defendant-Appellant.

Third District   No. 81—353

Opinion filed March 21, 1983.

468

Robert Agostinelli and Frank W. Ralph, both of State Appellate Defender's Office, of Ottawa, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCOTT delivered the opinion of the court:

During the Christmas season of 1980, Lisa Conn, a young lady, presumably with a long life awaiting her, was slain in a brutal manner. The slaying occurred on December 6, 1980, in the back room of the Zip-Tone Cleaners in Peoria where Lisa was employed. Lisa's throat was slashed and the cash register of the business was looted.

Initially the police were without suspects. The police worked tirelessly in their efforts to solve the crime and ultimately conducted over 3,000 interviews. The citizens of Peoria and surrounding environs were justifiably outraged and a reward fund was established which eventually totalled over $20,000. Newspapers, television stations and one radio station gave unabated coverage of this case from the time of Lisa's death up to and throughout the trial of the defendant, Alan R. Taylor, who was charged with and tried for the commission of the crime. The news media coverage may well have been the most extensive of any crime ever committed in the city of Peoria.

One of the suspects interviewed by the police was the defendant, who at the time was 13 years of age. The police conducted several interrogations of him. In his final statement, Taylor confessed that he had cut Lisa's throat with a knife, looted the cash register and left the premises. Somewhat exculpatory in tone, however, he indicated that the throat cutting occurred because Lisa was struggling against the knife as he held it to her throat. Taylor also said that he was aided in the crime by a friend of his, John Gaskins. He said that Gaskins also had a knife. He said that the stab wound in the area of Lisa's heart occurred when Lisa kicked Gaskins in the leg, causing Gaskins to lose his balance and fall into Lisa with his knife.

Charged and tried as an adult, Taylor was convicted by a jury of murder and armed robbery. He was sentenced to a 35-year term of

imprisonment for the murder and a 30-year term for the armed robbery, with both terms to run concurrently.

The foregoing is a brief statement of the facts concerning the murder of Lisa Conn and the trial of the defendant for that crime. Further facts and procedural matters will be set forth as they become pertinent to the determination of this appeal.

A number of issues are raised in this appeal and our attention is first directed to the defendant's claim that reversible error was committed because the trial court abused its discretion in denying his motion for change of venue because of prejudicial publicity, which was extensive and which continued up to and during the trial.

Placing this issue in its proper perspective, it must be noted that on April 9 and 10 of 1981, some four months after the murder, a public opinion survey was conducted at a large shopping mall in the city of Peoria. The uncontroverted result of the poll was that 98% of 382 people polled had heard of the case; 89% stated they had heard of it many times; 61% were able to state the defendant's age; 72% believed that the police had arrested the right person; and 53% thought that the defendant was guilty.

In considering the results of the poll it can only be logically observed that such percentages of knowledge concerning a crime could be expected in a small or modest-sized community; however, in a large metropolitan area such percentages illustrate the pervasive effect of saturation news coverage.

■ The general rule of law applicable to motions for change of venue is that the decision as to whether a change of venue should or should not be granted rests in the sound discretion of the trial court, and refusal to grant a change of venue is not error if later events indicate that the defendant received a fair and impartial trial. (*People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321.) However, an old supreme court case from which our State establishes some law, still viable, which sets some guidelines to be followed by a trial judge in granting or denying a motion for change of venue. (See *People v. Pfanschmidt* (1914), 262 Ill. 411, 104 N.E. 804.) In *Pfanschmidt* the court indicated that if affidavits before the court created a reasonable apprehension that an accused could not receive a fair trial, then a change of venue should be granted.

Relying, however, upon the law set forth in the case of *Yonder* we will examine the record to ascertain whether the defendant did receive a fair trial. Both pretrial and during-trial news coverage disclosed that a companion of the defendant was also a suspect in the murder. The companion, John Gaskins, according to pretrial news cov-

erage, was released from custody after he had passed a lie detector test. Similarly it was reported that the defendant had taken a lie detector test and one article reported that he had failed it while another stated that it was inconclusive.

The "little black box" or lie testing equipment, while apparently not infallible, has been used in criminal investigations for many years and has been adopted by some employers for use in screening applicants for employment. In the minds of laymen it has achieved the status of being the "last word" in determining the truthfulness or untruthfulness of an examinee.

Such publicity is highly prejudicial and in fact prevented a fair trial. Counsel for defendant was compelled to use all peremptory challenges and many challenges for cause were denied. All prospective jurors questioned by the court admitted to having heard of the case and some of those selected knew details concerning the offense and the defendant's alleged involvement. In selecting the jury the magic words were the statement by a prospective juror that he or she had no opinion about the case and could be fair to both sides. Is this statement a magic one? We believe not and neither does the United States Supreme Court, which stated:

> "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father." *Irvin v. Dowd* (1961), 366 U.S. 717, 728, 6 L. Ed. 2d 751, 759, 81 S. Ct. 1639, 1645.

A case of some similarity to the one now before us is *Goins v. McKeen* (6th Cir. 1979), 605 F.2d 947. In *Goins* four jurors read an article during trial which revealed information which was both inadmissible and strongly probative of guilt. All four assured the court that they could decide the case solely on the evidence presented. The Sixth Circuit court found the trial court's reliance on these assurances to be insufficient and of inherent prejudice to the defendant.

In the instant case two jurors had knowledge about the case which was prejudicial and inadmissible. Two jurors during examination stated that the codefendant (Gaskins) had been released after he passed a lie detector test. One stated that he had therefore concluded that Gaskins was innocent. Three other jurors were aware of Gaskins' release but attributed it to lack of evidence. Not all knowledge of a case would *per se* disqualify a prospective juror; however, in the instant case some of the jurors were too knowledgeable about matters too volatile.

In regard to the five jurors referred to, they were seated after

the defendant had exhausted his 10 peremptory challenges and the court had denied a request for additional peremptory challenges. The defendant challenged the seating of the jurors for cause; however, these challenges were denied.

■ The record in this case amply supports the conclusion that the motion for change of venue should have been granted. The record does show that the trial judge made a strenuous and dedicated effort to obtain for the defendant an impartial jury; however, as the result of the news media coverage of the crime and case which saturated Peoria and an area of some miles in all directions from the city, the trial judge was faced with a "no-win" situation.

The change of venue problem which we address is not an isolated one, but on the contrary is one which has pervaded our nation. Justice Frankfurter in a concurring opinion in the case of *Irvin* made the following observation:

> "More than one student of society has expressed the view that not the least significant test of the quality of a civilization is its treatment of those charged with crime, particularly with offenses which arouse the passions of a community. One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure. These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him. How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception.

> Not a Term passes without this Court being importuned to review convictions, had in States throughout the country, in which substantial claims are made that a jury trial has been distorted because of inflammatory newspaper accounts—too often, as in this case, with the prosecutor's collaboration—exerting pressures upon potential jurors before trial and even during the course of trial, thereby making it extremely difficult, if not impossible, to secure a jury capable of taking in, free of prepossessions, evidence submitted in open court. Indeed such extra-

neous influences, in violation of the decencies guaranteed by our Constitution, are sometimes so powerful that an accused is forced, as a practical matter, to forego trial by jury. [Citation.] For one reason or another this Court does not undertake to review all such envenomed state prosecutions. But, again and again, such disregard of fundamental fairness is so flagrant that the Court is compelled, as it was only a week ago, to reverse a conviction in which prejudicial newspaper intrusion has poisoned the outcome. [Citations.] This Court has not yet decided that the fair administration of criminal justice must be subordinated to another safeguard of our constitutional system—freedom of the press, properly conceived. The Court has not yet decided that, while convictions must be reversed and miscarriages of justice result because the minds of jurors or potential jurors were poisoned, the poisoner is constitutionally protected in plying his trade." *Irvin v. Dowd* (1961), 366 U.S. 717, 729-30, 6 L. Ed. 2d 751, 760-61, 81 S. Ct. 1639, 1646-47.

We hasten to add that in the instant case the record is barren of any collaboration or misconduct on the part of the office of the prosecutor. Until such time that there is a solution to the problem of such magnitude as presented in this case the trial courts will be compelled to grant motions for change of venue and along with such ruling the attendant added expense and inconvenience. We are aware of and subscribe to the old adage that a defendant cannot expect a perfect trial, a trial free from all errors; however, he can expect from the judicial system that every effort will be made to provide him with a fair trial.

The denial of trial by an impartial jury is not a technical defect but is the denial of a right imbedded in both our Federal and State constitutions. Such a right comprises a great portion of the foundation of our judicial system.

The right to an impartial trial was not granted to the defendant in this case and hence we must reverse his conviction and remand this case with directions to grant a motion for a change of venue to a county outside the scope and orbit of the news media, which covered pretrial and during-trial activities of this case.

Though this case will be retried, it is necessary that we consider some of the other errors raised by the defendant. He challenges his prosecution as an adult rather than as a juvenile. The statutory provisions relating to this question are set forth in the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 702—7).

The defendant claims that the trial court lacked jurisdiction to

consider the State's motion to transfer the prosecution to adult court since his natural father was admittedly given no notice of the proceedings. Taylor lived with his natural mother and his stepfather, his mother having divorced his natural father in 1973 and married again. The whereabouts of his natural father were unknown. Mrs. Taylor had no idea where he could be found.

■ Our supreme court has laid this objection to rest. (*In re J.W.* (1981), 87 Ill. 2d 56, 429 N.E.2d 501.) Since the mother as custodial parent was properly served and had notice of the proceedings, the juvenile court had jurisdiction despite lack of service or notice upon the noncustodial father.

Defendant further argues that the trial court abused its discretion in applying the transfer standards of the Juvenile Court Act but that, in any event, the Juvenile Court Act is unconstitutional because it fails to provide adequate due process safeguards such as an articulated burden of proof, and that it fails to furnish guidelines for the relative weight to be given the six statutory factors the trial court must consider before ordering transfer to adult court.

In sum, section 2—7(3)(a) of the Juvenile Court Act authorizes prosecution of a juvenile as an adult when the court finds, after hearing, that it is not in the best interest of the minor or of the public to proceed under the Juvenile Court Act. The statute requires the court to consider the following factors in arriving at its determination:

> "(1) whether there is sufficient evidence upon which a grand jury may be expected to return an indictment; (2) whether there is evidence that the alleged offense was committed in an aggressive and premeditated manner; (3) the age of the minor; (4) the previous history of the minor; (5) whether there are facilities particularly available to the Juvenile Court for the treatment and rehabilitation of the minor; and (6) whether the best interest of the minor and the security of the public may require that the minor continue in custody or under supervision for a period extending beyond his minority." Ill. Rev. Stat. 1981, ch. 37, par. 702—7(3)(a).

From our examination of the record, it is clear that the trial court conducted a proper hearing in compliance with the statute. Extensive evidence was presented pertaining to the six criteria detailed in the statute.

At the transfer hearing, the prosecution and the defense stipulated to a number of agreed facts. Additionally, testamentary evidence was presented. A summation of the evidence discloses that the defendant was 13 years of age and had neither a criminal nor a juve-

nile delinquency record; that Lisa Conn, age 17, was slashed and stabbed at the Zip-Tone Cleaners in Peoria on December 6, 1980; that the probable cause of Lisa's death was a six-inch slicing laceration of the neck which went through muscle and cut an internal carotid artery; that the defendant had admitted cutting Lisa's throat with his knife but claimed that the cut came because Lisa was struggling. Defendant's statement further admitted robbing the Zip-Tone Cleaners after Lisa was slashed and stabbed. As indicated earlier, the defendant's statement was somewhat exculpatory in tone as regards the throat slashing, and, also, as it attempted to shift the blame for the stabbing. His statement indicated that Lisa was stabbed as she kicked at an accomplice, John Gaskins, whereby her kick caused Gaskins to lose his balance and fall into the victim's chest with his knife. Defendant offered a considerable amount of evidence to the effect that he was of good character. A psychologist, Theodore Mathews, testified that the defendant was not suffering from any serious psychopathology and was not dangerous. The psychologist further stated that the defendant would have no difficulty in conforming his behavior to social standards. He admitted, however, that his underlying assumption in evaluating the defendant was that the defendant was innocent of killing Lisa Conn. He further conceded that if the defendant had committed the crime, it would be difficult to reconcile the results of his psychological evaluation with such fact. Based upon his steadfast opinion, however, it was his opinion that the defendant was not a threat to society.

In announcing its decision on the transfer motion, the trial court stated as follows:

"*** The court would announce to those here that it has considered all the relevant factors, particularly those contained in Section 702—7 of the Juvenile Court Act.

Without attempting to state all the reasons for my decision, it is appropriate to point out some important factors therefor.

The clinical psychologist's (Mr. Mathews) evaluation seems to suggest that there is nothing in the mental make-up of the minor which would make him difficult to treat or a future danger. Going a step further, the psychological information presented would also seem to indicate that Alan Taylor could not have committed the offense charged. It seemed from the testimony that Mr. Mathews was required by his findings to conclude that Alan Taylor was innocent.

If, however, the minor did commit the offense, then the conclusions of Mr. Mathews would be inaccurate. The minor then

would be a person devoid of empathy and for whom the period of rehabilitation would be long, the prognosis guarded and the likelihood of future violent acts great.

The depth of the problem, if Alan Taylor was involved in Lisa Conn's death, is corroborated by the incredulous reaction of those who apparently know him well regarding his alleged involvement.

Clearly, if this minor is the perpetrator of the offense alleged, then his treatment and [the] best interest and the security of the public may and almost surely will require that he be continued in custody or under supervision for a period beyond his minority.

It is not a function of this proceeding to address the question of guilt or innocence, but rather only to determine the appropriate forum in which that determination will be made.

Prosecution under the criminal laws of this state offer the primary parties hereto the more appropriate forum for determining guilt or innocence. The minor will be protected by the full complement of rights available to adults to insure, whatever the outcome, it is the one based on the facts and the applicable law. The public will be served by the availability of an extended period for rehabilitation should guilt beyond a reasonable doubt be established.

The motion of the State's Attorney to permit prosecution under the criminal laws of Illinois is well taken and it is granted."

The trial judge's pronouncement and his ruling to transfer the juvenile for prosecution as adult are well supported by the record. In his statement, the judge indicated that he was not attempting to state all of the reasons for his decision. The law does not require that he do so. All that is required is preservation of the record which will allow a meaningful review of the judge's exercise of discretion. (*People v. Cater* (1979), 78 Ill. App. 3d 983, 398 N.E.2d 28.) Transfer proceedings are not adjudicatory in nature, but rather represent an exercise of discretion. There was no abuse of discretion in this case.

Finally, as regards the transfer proceedings, defendant's challenge to the constitutionality of the statute is without merit. The statute is constitutional. Defendant argues that the failure of the statute to articulate a burden of proof and to furnish guidelines for the relative weight to be given the six statutory factors deprives the defendant of the due process of law. This argument has previously been made and rejected. (*People v. Taylor* (1978), 61 Ill. App. 3d 37, 377

N.E.2d 838, *aff'd* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.) Therein it was pointed out that it is not constitutionally required and would not be feasible for the statute to prescribe a mathematical formula to govern the judge's discretion.

Defendant's statements to the police were critical to his conviction. Had Alan R. Taylor not talked, the People would presumably have had a difficult time mounting a successful prosecution. Prior to the trial, the defendant moved to suppress his statements and written confession.

The suppression hearing included the testimony of the two interrogating officers, Robert Crady and Larry Layman, a police stenographer, Cilestene Penny, the defendant's mother and stepfather, Rebecca Rushing and David Rushing, a psychologist, Theodore Mathews, and the defendant himself.

At the conclusion of the hearing, the trial judge rendered a detailed five-page order containing findings of fact and conclusions of law. In sum, he found that the defendant's statements were given after he had been fully advised of his constitutional rights per *Miranda* and that the defendant had knowingly and understandingly waived those rights. The court found no evidence of coercion, duress, compulsion or mistreatment. Although the court noted that there were several interrogations, it further observed that there was no continual coercive type of investigation. The court further noted that the defendant never exercised or expressed a desire to exercise his right to remain silent, but at all times freely and voluntarily discussed the subject of the interrogation with the police.

After a careful scrutiny of the record, we agree with the trial court. Indeed, we find that the attitude of the defendant could be described as one of wholehearted and willing cooperation.

The circumstances surrounding the interrogations of the defendant, however, were not absolutely flawless. One of the officers was profane and demanding. The other was friendly and supportive. This type of verbal whip-saw was used to good effect to keep the defendant talking and to get at the truth. This technique of interrogation is commonplace both in and out of the courtroom. Standing alone, it does not constitute coercion or duress. During the interrogation of February 7, 1981, one of the officers apparently told the defendant that they were going to keep talking to him as long as he continued to lie. One interpretation that could be put on this statement would be that the defendant had no right to stop talking, thus undermining the protections of *Miranda*. While we regard such statement as improper, we cannot view it out of context and in isolation. The defendant's sev-

eral and separate interviews ranged over several days. Each time the defendant was given his *Miranda* warnings. The defendant never indicated that he was unwilling to meet and talk with the police. While talking with the police, he never indicated that he wanted to stop. He was never told that he could not go home. He was not arrested until his confession of February 14, 1981. His stepfather was present during the February 7 interrogation and during the taking of the written statement on February 14.

■■■ We well recognize that it is the burden of the State to show that a person knowingly and voluntarily waived his rights to remain silent before his statement can be admitted into evidence. We also recognize the fact that this defendant was a 13-year-old seventh grader without prior police involvement. We have, accordingly, given extra care and attention to the record. In that connection we have considered the totality of the circumstances according to the test promulgated by our supreme court. Having done so, we conclude that the defendant's statements were made freely, voluntarily, and without compulsion or inducement of any sort and that the defendant's will was not overcome. *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.

Having concluded that the defendant should have a new trial, it is not necessary that we consider the other issues raised by the defendant in this appeal.

For the reasons stated the conviction of the defendant by the circuit court of Peoria County is reversed and this case is remanded with directions as set forth in this opinion.

Reversed and remanded with directions.

BARRY, P.J., concurs.

JUSTICE HEIPLE, dissenting:

Despite the pretrial publicity surrounding this case, I believe that the defendant received a fair trial by an impartial jury and I would affirm the conviction. *People v. Strange* (1980), 81 Ill. App. 3d 81.

I agree that the sheer quantity of media coverage generated by the grim circumstances of this case would have made a change of venue desirable in order to prevent venue from becoming an issue. But this does not automatically point to the conclusion that refusal to transfer venue was an abuse of discretion. The main consideration is not the correctness of the trial court's ruling on the motion for

change of venue or the quantity and quality of the publicity involved, but whether upon the record the defendant received a trial before a fair and impartial jury. That is to say, was the defendant prejudiced in any way by the court's ruling? If the defendant was not prejudiced, then the error was harmless. (*People v. Yonder* (1969), 44 Ill. 2d 376, 388.) Considering the record as a whole, it is apparent that the trial court went to great lengths to select a fair jury and to insure that the trial proceeded free from media influence. As hereinbelow indicated, the record discloses that defendant received a fair trial. To grant him a new trial for what is at worst a harmless error is most probable a useless gesture and is most certainly an affront to the judicial process.

The conclusion that defendant is entitled to a new trial can only be arrived at by means of speculation and conjecture as to the effect of pretrial publicity upon the minds of the prospective jurors. This is the flaw in the majority opinion. One need not guess as to whether media coverage prevented the defendant from receiving a fair trial. The trial record clearly discloses that defendant received a fair trial before an impartial jury.

Defendant argues that due to extensive media coverage, it was impossible for him to receive a fair trial. Yet the defendant's own statistics refute his contention. Of the 382 registered voters surveyed, 98% had heard of the case and 89% had heard of it often. Fifty-three percent thought the defendant was guilty, but 43% had formed no opinion regarding defendant's guilty or innocence. Although indicative of extensive media coverage, these statistics also show that a significant group of those surveyed was unbiased. It was certainly not impossible to select an impartial jury based on those figures, and the court's detailed and extensive *voir dire* examination guarded against selection of prejudiced jurors.

During *voir dire* examination, the court employed a more rigorous selection standard than required by excusing for cause any prospective jurors who had formed an opinion regarding the guilt or innocence of the defendant even when they stated that they could set aside their opinion and judge the defendant based solely on the evidence presented. In choosing the jury, 47 out of 71 prospective jurors were questioned over a three-day period. Three days is not an inordinate amount of time to devote to jury selection under the circumstances of this case and there was no indication of any unusual difficulty in obtaining an acceptable jury. Of the 12 jurors finally selected, only five were objected to for cause by the defendant and those objections were properly overruled by the court.

The juror Lingenfelter, who was objected to for cause, knew that a young girl was found knifed to death in the Zip-Tone Cleaners; that defendant and Gaskins were arrested and that Gaskins was eventually released after he passed a lie detector test. Lingenfelter had not read anything about the court proceedings that occurred prior to the trial, however, and had in fact been away from the Peoria area for the entire month of January. Although Gaskins was released after passing the lie detector test, Lingenfelter did not make any assumptions with respect to the guilt or innocence of the defendant from the release of Gaskins. Neither did he question or relate the release of Gaskins to the defendant. He had not formed any opinion at all with respect to the defendant. He stated without hesitation or equivocation that he would put aside whatever knowledge he had of the case and decide defendant's guilt or innocence based on the evidence presented.

Juror Thorpe, also objected to for cause, stated that he had read articles about the matter around the time of the occurrence but could not recall any specifics. Although he recalled the defendant's name, he had not read anything about the defendant in the newspaper. Prior to being called as a juror, he had not read or heard anything about the court proceedings. He did remember that another youth had been accused who was later released after passing a lie detector test. Although this made him believe that the other youth was innocent, he did not draw any inferences with respect to the defendant nor did he form any opinion about the guilt or innocence of the defendant. Since being called as a juror, he had avoided all newspaper and television accounts of the matter. He assured the court that he could set aside those things that he had already heard and decide the case based on the evidence presented at trial.

Juror Jacobson, challenged for cause, was seated by the court. Although defendant had peremptory challenges remaining, he chose not to exercise a peremptory challenge on juror Jacobson. Jacobson had read some news accounts of the killing and investigation. He remembered the names Taylor and Gaskins and that charges were dropped against Gaskins. However, he had formed no opinion of the case nor any opinion as to the guilt or innocence of the defendant. In great detail, the court interrogated him about presumption of innocence, reasonable doubt, burden of proof and the necessity that only evidence presented in the courtroom be considered. Jacobson indicated that he could and would follow the court's instructions and that he knew of no reason why he could not be fair and impartial to both sides. Apart from the fact that juror Jacobson was established to be impartial, the defendant is in no position to claim prejudice where he declined to ex-

ercise an available peremptory challenge on this juror when his challenge for cause had been denied. His failure to utilize an available peremptory challenge amounts to a waiver of his challenge for cause.

The same waiver may be said to apply to defendant's challenge for cause to the juror, Betty Schlick. He failed to exercise an available peremptory challenge to juror Schlick when his challenge for cause was denied. In any event, juror Schlick was fully examined and correctly accepted by the trial curt. The typewritten transcript of juror Schlick's *voir dire* examination consumes 15 pages. She knew of the case from newspaper and television accounts. She was familiar with the Zip-Tone Cleaners, having dones business there six or seven years previously. She stated she would have no difficulty setting aside anything she may have heard of the case. She would decide the case solely on the basis of the evidence presented in the courtroom. She had no opinion about the guilt or innocence of the defendant. She accepted the proposition that the defendant was presumed innocent and that the burden was on the State to prove his guilt beyond a reasonable doubt.

The same waiver may be said to apply to defendant's challenge for cause to the juror, Betsy Janssen. He again failed to exercise an available peremptory challenge when his challenge for cause was denied. But once again, juror Janssen was fully examined and correctly accepted by the trial court. Although she had read and seen accounts of the killing in the paper and on television, and she remembered the names of Alan Taylor and John Gaskins, she had formed no opinions about the case. She had done business at the Zip-Tone Cleaners a couple of years previously. She indicated that she would be able to set aside anything that she had heard or read of the case and could decide it solely on the basis of the evidence presented in the court room. She further indicated that she would follow the law as to presumption of innocence and proof of guilt beyond a reasonable doubt.

I certainly do not think that the statement by a prospective juror that he or she has no opinion about the case is some kind of magic talisman insuring impartiality. But when the record of a detailed and thorough *voir dire* examination supports a juror's assertion that he or she has in fact formed no opinion, such statement should be given credence. Due process does not require that a jury be totally ignorant of the facts or issues of a particular case. (*Irvin v. Dowd* (1961), 366 U.S. 17, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) If a high degree of public awareness raises the possibility of local prejudice, the trial court should take steps to prevent such a result. Should the court, in its discretion decide that less extreme measures than a change of venue can

be employed to avoid such prejudice, a reviewing court should carefully examine those measures to determine their effectiveness. In this case, I believe that the trial court successfully prevented any potential prejudice among the jurors. A new trial would change nothing.

Defendant has raised a number of additional issues not discussed by the majority since they have reversed for other reasons. The defendant, having exhausted his peremptory challenges during *voir dire*, claims that it was error for the court to refuse to give him extra challenges. This argument is without merit. Although starting with 10 peremptory challenges, in six instances defendant used peremptory challenges without first challenging for cause. It is possible that the trial judge may have excused such jurors for cause if defendant had asked. The fact that defendant exercised peremptory challenges without first challenging for cause, and thus possibly wasting his peremptory challenges, does not require the trial judge to extend extra challenges as a matter of right.

As for defendant's contention that the court abused its discretion in refusing to sequester the jury, the defendant has failed to demonstrate any prejudice as a result of the court's ruling. If the jury is adequately admonished by the court and there is no showing that defendant was prejudiced, a refusal to sequester the jury is not reversible error. (*People v. Yonder* (1969), 44 Ill. 2d 376.) Defendant has simply alleged the possibility of prejudice and questioned whether the court's repeated admonitions to the jury had any real effect. Thus, defendant has failed to demonstrate any abuse of the court's discretion.

Defendant next argues that his conviction and concurrent sentence for armed robbery must be vacated because it is an included offense of felony murder.

Convictions and concurrent sentences may not be entered when more than one offense arises from the same physical act, or one of the offenses is, by statutory definition, an included offense of the other. (*People v. King* (1977), 66 Ill. 2d 551.) Although the offenses in the present case arose from a series of separate and distinct physical acts, armed robbery is, by definition, included in the offense of felony murder. *People v. Devine* (1981), 98 Ill. App. 3d 914.

In *Devine*, this court relied upon the definition of an included offense set out in section 2—9 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 2—9). An included offense is established by proof of the same or less than all of the facts required to establish the offense charged. Felony murder is defined as a killing which occurs during the commission of a forcible felony other than voluntary man-

slaughter. (Ill. Rev. Stat. 1981, ch. 38, par. 9-1(a)(3).) When the forcible felony of armed robbery is the basis for felony murder, the same facts required to prove felony murder also establish the underlying offense. Proof of a forcible felony is an essential element included within the offense of felony murder. Therefore, I would vacate defendant's armed robbery conviction. But, contrary to defendant's argument, remandment for a new sentencing hearing is not required.

Defendant relies on *People v. Filker* (1981), 101 Ill. App. 3d 228, in which this court held that a remand is necessary where the trial court could have improperly considered a second conviction *based on the same act* as supports the conviction for which the defendant was sentenced. The decision in *Filker* involved convictions for attempted murder and aggravated battery. Both offenses were established by the very same physical act. *Filker* is thus distinguishable since the present case involves offenses which are established by different physical acts.

Next, the defendant argues that this case should be remanded for resentencing because the trial court improperly considered as a statutory aggravating factor that defendant's conduct caused death to another person. According to the defendant, the fact that his conduct caused death may not be considered as an aggravating factor since it is an implicit element of felony murder. (*People v. Brownell* (1980), 79 Ill. 2d 508.) Although I agree that death is implicit in the offense of murder, the record in this case reveals that the judge was considering not just the fact of death, but was actually concentrating on the brutal and heinous manner in which the defendant killed Lisa Conn. As a general proposition, in passing sentence, a judge may consider the circumstances under which the crime was committed. (*People v. Heflin* (1978), 71 Ill. 2d 525, 546.) While this is not *per se* a statutory factor in aggravation, the fact that the judge in the present case referred to it as such, is simply a misnomer and of no consequence. The court acted properly in considering the brutal and heinous nature of defendant's conduct before imposing sentence.

The defendant's final argument is that the court abused its discretion in sentencing him to concurrent 30- and 35-year terms of imprisonment. Sentencing is the function of the trial court, and a reviewing court should not substitute its judgment absent an abuse of the trial court's discretion. (*People v. Lykins* (1979), 77 Ill. 2d 35.) The record establishes that the trial judge reviewed all of the evidence received at trial, the presentence report and evidence and information offered in aggravation and mitigation. He likewise considered the arguments and sentencing alternatives as expressed by respective counsel. In so

doing, the trial judge observed in mitigation that defendant had no history of prior delinquency or criminal activity. In aggravation, the trial judge properly considered the fact that defendant's conduct not only caused the death of another person, but was exceptionally brutal and heinous. Based upon the nature and circumstances of the offenses and the history and character of defendant, the trial judge determined that it was necessary for the protection of the public that defendant be incarcerated. He also found that a sentence other than incarceration would deprecate the seriousness of the instant offenses. In accordance with his findings, the trial judge determined that a higher than minimum term of imprisonment should be set.

In light of these findings, the mere fact that defendant is only 14 years old, possesses rehabilitative potential, and has no prior criminal record does not militate in favor of a more lenient sentence. In view of the seriousness of the defendant's acts, the court acted within its discretion in imposing a 35-year term of imprisonment.

To summarize, the only relief that this defendant is entitled to is reversal of his armed robbery conviction. In all other respects, the record shows that defendant has received a fair trial free from prejudical error. Justice would best be served by affirming the murder conviction and sentence. For these reasons, I cannot concur in the majority's decision to give defendant a new trial. Therefore, I respectfully dissent.